## Sadie Wallace v. The State.

### No. 2661.    Decided November 26, 1902.

**1.—Murder—Evidence—Threats.**

On the trial of a wife for the murder of her husband, it was competent to prove threats by deceased against the life of defendant, although no actual demonstration had been shown on the part of deceased to execute the threats.

**2.—Same—Remarks by Judge.**

On the trial of a wife for the murder of her husband, after defendant had testified that deceased attempted to strike her, it was clearly competent to prove that deceased had threatened to kill her before the week was out, and it was error for the judge to remark that he was doubtful if the evidence was admissible, but would give her the benefit of the doubt and admit it. Such remarks were in violation of the statute and prejudicial to defendant.

**3.—Same—Brutal Treatment by Deceased.**
    On the trial of a wife for the murder of her husband, it was error to exclude testimony of previous acts of cruelty and brutality committed by him upon her, where the evidence tended to show self-defense from apparent danger.  These occurrences between the husband and wife were admissible as tending to explain the action of the parties at the time of the difficulty.

Appeal from the District Court of Falls.  Tried below before Hon. Sam R. Scott.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The indictment charged appellant with the murder of Sim Wallace (her husband), on the 27th day of May, 1902, by shooting him with a pistol.

The essential facts are staed in the opinion.

No briefs for appellant have come to the hands of the Reporter.

*Rob't A. John,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree, and given five years in the penitentiary.

The evidence for the State discloses that deceased was the husband of appellant, and was shot by her in the field where he was hoeing cotton. There had been a previous difficulty, a day or so prior to the homicide, between the parties, in which deceased was the aggressor.  On the evening of the difficulty appellant borrowed a pistol from the witness Vaughan, giving false reasons at the time for wanting said pistol.  After obtaining it, she went to the place where her husband was at work.  The witness Long testified that he was working with deceased at the time appellant came, and remarked to deceased, as he saw her approaching, "There comes your wife."  Upon reaching the parties, defendant said to her husband that she understood that he had quit her.  To this he made no reply.  She further remarked, "Well, if you have quit me, I want you to give me enough money to carry me to my mother and father."  This witness seems to have heard no further conversation between them, as he went off some distance, and was absent awhile. Shortly after this occurrence, the parties left that portion of the field, and went to another point, and began hoeing cotton.  Just after reaching this point, appellant said to her husband, "Come, and let's go; I have got to go."  Deceased made no reply.  She then asked him: "Ain't you going home?  Come on, I have got to go home."  While the wife was making these remarks, deceased seemed to have been silent, and continued his work.  Finally he said:  "How many homes have you got?  Go on."  At this point witness says that appellant was standing with her arms folded, and he turned his back on her, and went to hoeing.  Just as he did so, he heard a gun fire, and saw deceased fall. She fired four shots, all of which seem to have taken effect.  This is a sufficient statement of the State's side of the case for a discussion

of the questions raised. Defendant testified that when she went to the field where deceased and witness Long were at work she gave the usual salutation, and said to her husband, "I heard you had quit me." Witness Long said he had been trying to talk to her husband about it, and could not do anything with him, and was sorry for her. Deceased made no reply, but kept "chopping cotton." She again remarked to deceased, if he had quit her, she wanted to know it, and, if he had not, she wanted to know it; that she did not know what to do; and that her people lived a long way off, and that she had no one to depend upon but him. He replied, "Well, I have quit you." She then asked him upon what ground, and deceased replied, "You know the reason." She said, "You were beating me, and kicking me, and I had to do something." And he replied, "Well, that is not sparing me a bit." Appellant then remarked to him: " 'Well, there is no use of us having any trouble. If you don't want me, just give me some money, and I will go to my people, and take my baby.' He replied that he was not going to give me a damn cent, and that I would never see my mammy and daddy any more. I told him he ought not to talk that way, and that I had not talked that way to him. I then told him I would go to Hatter's, and he asked me where the baby was, and I told him at Hatter's. He says, 'You leave the baby there, and you be damn sure you go home.' I says, 'Well, if you have quit me, why do you want me to leave the baby?' He says: 'You go home, and I will settle with you. I am going to kill you.' I says, 'Well, I don't want to go home, but will go to Prince Pendarvis', and stay there until I can get to my people.' He says, 'I have told you you would never see your mammy and daddy any more; and if you are not going home you are not going anywhere, and I will settle with you when I get you there to-night.' Deceased and Flem Long had been chopping on rows that ran east and west, and Flem had gone on, and Flem had started back on Sim's row, and I says, 'Well, I will go to Hatter's and stay all night, and maybe to-morrow you will be better satisfied, and won't be angry.' And he says: 'If you start away from here, I will burst your damn brains out. I told you to go home, and if you are not going there, you are not going anywhere.' At this time Flem had got back, and said something about going to the other piece of cotton to chop. I told him, 'I did not want to go up there, and that I would go home if he wanted me to.' He says, 'No, you go on with me,' and I went, and they started to chopping. I said: 'What do you intend me to do? If you want me to go home, I will do so.' He says, 'I have told you. You are not going anywhere.' I said, 'Well, I am not going where? If you want me to go home, I will go.' He said, 'It looks like you are damn hard to understand,' and started to me. I backed as quick as I could, and fired the pistol. He saw it, and whirled, and when he did I shot him in the shoulder. I was scared and nervous, and shot as fast as I could. I shot him after that, and then I went on to get my baby," etc. She further states that at the time she fired the shot deceased was

approaching her with his hoe drawn in a striking attitude; and, further, that the reason she fired the pistol was because deceased had threatened her life. The testimony further shows that prior to the fatal difficulty there had been trouble between defendant and her husband, in which he had committed a serious or violent assault upon her, and subsequent to which he had threatened to kill her. In fact, the testimony shows that their lives had not been as harmonious as they should have been for some six months prior to the homicide.

Through the witness Alf Knowles appellant proposed to prove threats against her life by the deceased. This testimony seems to have been excluded by the court because no actual demonstration had been shown on the part of deceased to execute the threat. We think this was error.

After appellant had testified that deceased had made an attempt to strike her with the hoe, the witness Pendarvis was tendered for the purpose of showing that deceased had told him (witness) that he (deceased) would kill defendant before the week was out. The court remarked, in passing upon the objection of the State, that he was doubtful if this evidence was admissible, but would give her the benefit of the doubt, and admit it. Exception was reserved to the remarks of the court, as, under the statute, he had no right to comment, and such comment tended to prejudice the minds of the jury against this evidence. This testimony, in our judgment, was clearly admissible. In admitting or rejecting testimony the court should refrain from comment.

By the witness Wiggins appellant proposed to prove, and could have proved, that deceased, in January or February, 1902, brutally beat defendant, and that he had knocked her down, and stamped her in the face and stomach, and by such conduct had caused her to miscarry. This was excluded, on the objection of the State. Further, while witness Smith was on the stand, and after he had testified that one night in February or March, as he was passing the house of defendant, he saw deceased beating appellant with a piece of hoe handle, defendant offered to prove that on this occasion he had beaten her until she was bloody, and witness believed that, had he not interfered, deceased would have killed defendant. This testimony should have been admitted. This character of testimony comes clearly within the rule laid down by the Supreme Court in Horbach v. State, 43 Texas, 242, and in Williams v. State, 14 Texas Crim. App., 102; Branch v. State, 15 Texas Crim. App., 96, and Hall v. State, 31 Texas Crim. Rep., 565. Mr. Wharton thus states the rule: "Taking the authorities as a whole, therefore, we may hold that it is admissible for the defendant, having first established that he was assailed by the deceased, and in apparent danger, to prove that deceased was a person of ferocity, brutality, vindictiveness, and of excessive strength; such evidence being offered for the purpose of showing either (1) that the defendant was acting in terror, and hence incapable of that specific malice necessary to constitute murder in the first degree; or (2) that he was in such apparent extremity as to make out a case of self-defense; or (3) that the deceased's purpose

in encountering the defendant was deadly." Whart. Crim. Ev., secs. 69-84. Mr. Bishop says: "Where the defendant, to excuse or mitigate his acts, claims that they were in self-defense or passion, the particulars of the transaction being thus material, and the law judging him by the facts and necessities as they appeared to him, whatever they truly were, he may give in evidence anything known to him of the character, prior conduct, threats, or other utterances of the person with whom he was contending, which, not as showing that the man was bad, but that in the special instance and circumstances he was dangerous, might reasonably have place among the considerations guiding his actions." 2 Bish. Crim. Proc., sec. 610. Whether the court believed the testimony of appellant in regard to her self-defense, it was before the jury, and any testimony which tended to strengthen that defense was clearly admissible. It was further admissible to show the probable terror of the appellant's mind; and especially is this true in this case. It tended to intensify the brutal conduct of the deceased towards appellant, and the terror naturally engendered in her mind at the time of the killing by reason of these former occurrences. These occurrences between the parties as husband and wife were admissible as tending to explain the action of the parties at the time of the difficulty. Hall v. State, 31 Texas Crim. Rep., 565; Medina v. State (Texas Crim. App.), 49 S. W. Rep., 380.

For the errors indicated, the judgment is reversed, and the cause remanded.

*Reversed and remanded.*