## BILL ECHOLS v. THE STATE.

### No. 3245.   Decided November 4, 1914.

### Rehearing denied November 25, 1914.

#### 1.—Murder—Evidence—Other Transactions—Character of Deceased.

Where, upon trial of murder, and the plea of self-defense, etc., the court permitted defendant to show the reputation of deceased to be that of a violent and dangerous man; that he had made threats against the defendant; that on a former occasion he shot the defendant and also his two brothers, and all acts of violence that defendant claimed he had heard deceased had been guilty of, there was no error in not permitting defendant to testify and to prove by others the details of said prior shooting. Following Menefee v. State, 67 Texas Crim. Rep., 201, and other cases.

#### 2.—Same—Evidence—Declarations of Third Parties.

Where, upon trial of murder in which defendant claimed self-defense, etc., and in which the court permitted him to testify to the injury he received, etc., at a prior shooting by deceased, there was no error in not permitting testimony to go to the jury as to what a witness individually knew about the former difficulty between deceased and the defendant, defendant not claiming that he had received any information from said witness in regard to that matter.

#### 3.—Same—Evidence—Acts of Third Parties.

The reason why a witness for defendant was carrying a pistol on the day of the homicide would be immaterial to any issue in the case, as what might have influenced the witness in carrying the pistol for the deceased should have no bearing on what influenced the defendant in firing the shot that killed the deceased.

#### 4.—Same—Evidence—Declaration of Third Parties—Argument of Counsel—Harmless Error.

Where it was not shown that a certain witness was dead or beyond the jurisdiction of the court, there was no error in refusing to permit other witnesses to testify as to what they heard the absent witness testify to at the examining trial; but the remark of State's counsel that the defense did not believe this testimony ought not to have been made, yet, this was harmless error.

#### 5.—Same—Evidence—Declarations of Deceased—Knowledge of Defendant.

Where, upon trial of murder, defendant did not claim that he had heard as to what deceased had said about a third party, there was no error in not permitting a defendant's witness to testify as to this statement; it is only acts of violence of which defendant knew or had heard, which were admissible in evidence. Following Patterson v. State, 56 S. W. Rep., 59, and other cases.

#### 6.—Same—Evidence—Acts of Third Parties—Acts of Deceased.

Where defendant claimed self-defense on trial of murder, it was the acts and conduct of deceased, and not those of a third party that defendant could rely upon, and it was not a question as to what said third party would have done under different circumstances, said third party testifying in full as to the acts of the deceased at the time of the shooting when he tried to place said third party in front of him.

#### 7.—Same—Evidence—Opinion of Witness.

Where the answer the witness could have given to the question propounded would have been but an opinion of the witness, there was no error in sustain-

Vol. 75 Crim.-24

ing objection thereto; besides, the answer was not given in the bill of exceptions.

### 8.—Same—Argumentative Questions—Examination of Witness.

Where the questions of defendant's counsel assumed the form of an argument instead of permitting the witness to state the facts, there was no error in not permitting such examination.

### 9.—Same—Evidence—Immaterial Matter.

Where it was not contended that the answer of the witness would have shown that he had been guilty of moral turpitude, there was no error in sustaining an objection propounded to the witness as to why he resigned the office of justice of the peace.

### 10.—Same—Evidence—Bias of Witness.

Where the question and explanation was clearly assuming facts that were not even shown in evidence, and the contrary was shown by the witness, there was no error in the court's action to sustain an objection thereto.

### 11.—Same—Evidence—Bias of Witness—Declarations of Third Party— Time and Place.

Where the defendant asked the witness whether it was not a fact that he had expressed his feelings to divers parties and did not name the parties, time and place, there was no error in sustaining objection thereto.

### 12.—Same—Evidence—Rebuttal.

Where the defendant had testified that he did not advance towards the deceased, there was no error in admitting testimony in rebuttal that defendant did go towards the deceased before he fired the shot that killed him.

### 13.—Same—Remarks by Judge—Harmless Error.

Where defendant attempted to show that a certain witness had permanently removed from the State, so that his testimony given at the examining trial might be proven up, and had thus shown that said witness had disappeared to avoid process, there was no reversible error in the court's remark, "Gentlemen, it appears to me that said witness has skipped out for the purpose of keeping away from this court," although he should not have used such remark.

### 14.—Same—Colloquy Between Court and Counsel—Practice.

The court should never lose his temper in ruling on evidence, and in a colloquy with defendant's counsel with reference to the latter's attempt to continually seek to introduce testimony that the court has held inadmissible, should enforce obedience to his ruling, not in the presence of the jury by yielding to his loss of temper, but by retiring the jury and reprimanding counsel.

### 15.—Same—Sufficiency of the Evidence.

Where, upon trial of murder, the evidence, although conflicting, sustained the conviction, there was no reversible error.

### 16.—Same—Former Law—Penalty—Murder in the First Degree—Article 743—Charge of Court.

While it was defendant's right to have the jury instructed as to the law as it exists now, and have applied the penalty to murder of the first degree as now fixed by law, yet, where the offense occurred before the recent law consolidating the elements of murder, and he made no objection to the court's charge submitting the case under the law as it existed when the alleged murder was committed, defining murder upon express and implied malice and the punishment attached thereto, he could not raise the question for the first time in

his oral argument in this court, and it must be presumed that he elected to be tried under the law as it existed at the time the offense was committed, and there was no reversible error under article 743, Code Criminal Procedure.

**17.—Same—Charge of Court—Objections—Statutes Construed—Presumption.**

While defendant had a right to have the new law applied wherein the degrees of murder are consolidated, and the punishment for murder upon express malice was authorized to be ameliorated by the jury, yet where the offense was committed under the old law of murder and the court submitted the same thereunder, and no objection was made at the proper time to the court's charge, the contention of defendant that the court should have submitted the law as fixed by the last Legislature, wherein the degrees of murder are consolidated, etc., comes too late when made for the first time in this court, and it must be presumed that defendant elected to be tried under the law as it existed at the time of the commission of the offense. Following James v. State, 72 Texas Crim. Rep., 457, and other cases.

Appeal from the District Court of Nolan. Tried below before the Hon. W. W. Beall.

Appeal from a conviction of murder; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*Morrison & Morrison* and *Shepherd & Sandusky* and *Woodruff, Christian & Woodruff,* for appellant.—On question of admitting evidence as to details of former difficulties: Russell v. State, 11 Texas Crim. App., 288; Bullock v. State, 165 S. W. Rep., 196; Spencer v. State, 59 Texas Crim. Rep., 217, 128 S. W. Rep., 118.

On question of argument of State's counsel: Sasser v. State, 166 S. W. Rep., 1160.

On question of remarks by judge: Pharr v. State, 7 Texas Crim. App., 472; Kelly v. State, 33 Texas Crim. Rep., 31.

On question of punishment for murder in first degree: Maul v. State, 25 Texas Crim. App., 166; Howard v. State, 35 Texas Crim. Rep., 136; Washington v. State, 68 Texas Crim. Rep., 589, 151 S. W. Rep., 818.

*C. E. Lane,* Assistant Attorney General, for the State.

HARPER, JUDGE.—Appellant was convicted of murder, and his punishment assessed at life imprisonment in the penitentiary.

The killing occurred in Howard County and the venue changed to the county where the trial was had. The State's contention is that ill-will existed between deceased and appellant. Appellant had gone into the office of Dr. Leach armed with a shotgun and kept watch until deceased came along on the opposite side of the street, when he stepped out and raised his shotgun as if to shoot, when deceased jumped behind W. N. Brown and undertook to keep Brown between him and appellant for some time. Brown testified that he begged appellant not to shoot; that appellant told him (Brown) to get out of the way or he would kill them both, circling around all the time to get in position where

he could shoot the deceased, Clayton Black; that as soon as he did get in position he shot and killed Black. Coffman testifies that he went out there, and from appellant's actions he was afraid he would shoot again, and requested him not to do so, appellant replying, "He is as dead as hell."

Appellant's contention is that he was sick and was being waited on by Dr. Leach, and he was on his way to Dr. Leach's office for treatment when he saw deceased; that deceased jumped behind Brown and caught hold of Brown and kept advancing towards him, keeping Brown in front; that when deceased and Brown got near him (appellant) deceased shoved Brown aside and jumped at him; that he had been shot once before by deceased, and he thought deceased intended to kill him, when he fired. He gives as a reason why he carried the shotgun, that threats had been communicated to him that deceased had made, and he carried the gun for his protection.

The court submitted all the issues made by the testimony in a way not complained of by appellant when the charge was submitted to him for his inspection. No special charges were requested, and the only matters presented for review relate to the action of the court in ruling on the admissibility of the testimony introduced and offered to be introduced. There are some fourteen bills of exception in the record, a number of which may be grouped.

It is made to appear that some time before this difficulty deceased had shot appellant, and had also shot two of his brothers, and the record discloses that each of the parties since that shooting had made divers threats. The court permitted appellant to testify and to prove by others that deceased had shot him, the ball striking him in the back. Appellant desired to introduce proof relating to that shooting, and to testify in regard thereto himself—to give his version of that affair. This the court declined to permit him to do. It is made to appear in the record by testimony introduced by appellant that deceased when first tried for shooting him, was convicted and sentenced to five years in the penitentiary, the case being reversed by this court; that he was again tried and found not guilty of any offense in so doing. The case that was appealed to this court will be found reported in 65 Texas Crim. Rep., 336, 145 S. W. Rep., 944, and the facts will be there found fully stated, therefore it is unnecessary for us to state the evidence appellant desired to introduce. Appellant also desired to introduce the evidence and attendant circumstances accompanying the shooting of his two brothers by deceased. At least one of those cases was also tried and appealed to this court, and will be found reported in 65 Texas Crim. Rep., 116, 143 S. W. Rep., 932, and the facts in that case will be found therein stated. So it is unnecessary for us to state what evidence appellant desired to introduce as to this matter. It is thus seen that the merits attendant upon those matters had been tried out in the courts and fully determined, and the question is, did the court err in not permitting the merits of those cases to be again gone into in this case, which of necessity would have resulted in their retrial and detracted the attention of

the jury from the issues involved on the trial of this case. The court permitted appellant to introduce evidence tending to show the reputation of deceased was that of a violent and dangerous man; of all threats that had been made by deceased, whether communicated to appellant or not; the fact that appellant on a former occasion had been shot by deceased, and that deceased had also shot his two brothers, and any and all acts of violence that appellant claimed he had heard deceased had been guilty of, and this, we think, is as far as he should have permitted appellant to go. This question was decided in Menefee v. State, 67 Texas Crim. Rep., 201, 149 S. W. Rep., 138, and it was there held: "The rule we understand to be well settled that the details of extraneous crimes or supposed extraneous crimes will not be permitted even to show motive." In Johnson v. State, 74 Texas Crim. Rep., 179, we held: "To try the merits of these extraneous matters would detract the minds of the jury from the merits of the case then being tried, and be conducting a half dozen trials at one time. The fact that appellant had been informed that such matters occurred was admissible; that they did occur could be proven, but it was not permissible to go into details of these transactions, and the court did not err in so holding. In so far as the defendant himself was concerned, this court in the case of Wallace v. State, 44 Texas Crim. Rep., 300, has upheld the rule laid down by Wharton and Bishop: "Mr. Wharton thus states the rule: 'Taking the authorities as a whole, therefore, we may hold that it is admissible for the defendant, having first established that he was assailed by the deceased, and in apparent danger, to prove that deceased was a person of ferocity, brutality, vindictiveness, and of excessive strength; such evidence being offered for the purpose of showing either (1) that the defendant was acting in terror, and hence incapable of that specific malice necessary to constitute murder in the first degree; or (2) that he was in such apparent extremity as to make out a case of self-defense; or (3) that the deceased's purpose in encountering the defendant was deadly.' Whart., Crim. Ev., secs. 69-84. Mr. Bishop says: 'Where the defendant, to excuse or mitigate his acts, claims that they were in self-defense or passion, the particulars of the transaction being thus material, and the law judging him by the facts and necessities as they appeared to him, whatever they truly were, he may give in evidence anything known to him of the character, prior conduct, threats, or other utterances of the person with whom he was contending, which, not as showing that the man was bad, but that in the special instance and circumstances he was dangerous, might reasonably have place among the considerations guiding his actions.' 2 Bish., Crim. Proc., sec. 610." In the bill relating to the testimony of appellant, the bill shows: "Now tell the jury why you were afraid if you met Clayton Black or why you were afraid to meet Clayton Black. A. Why, because he had shot me once in the back. State's counsel: Wait a minute, Mr. Echols. Defendant's counsel: Just hold up till he makes his objection. Defendant: Because he— The court: Wait, Mr. Echols. State's counsel: We urge objection to that to his going into detail, any other

troubles being separate and independent transactions. The court: Well, I will permit him this question. Defendant: Well he— State's counsel: Well, he undertook to go into detail right then and said that it was because so and so, and I would like for you to instruct the witness how far he can go. The court: Well, I will say this to you, Mr. Echols, you can— Defendant: Yes, sir. The Court: You can state that he shot you so far as that is concerned; that you and he had former difficulties, etc., but as to going into details, just leave that out. Now, so far as details are concerned, just leave that out. Defendant's counsel: Now, note our exception. If your honor please, with all due deference to the ruling of the court, we think under the authorities, that when the defendant himself is put upon the stand that it has been held, time and again, and is the law, that he can tell of the circumstances in detail that caused him to act at the fatal conflict. The court: Well, I will permit him to. Defendant's counsel: And for that purpose, we want to prove by this defendant everything that prompted him to carry the gun and everything that prompted him to shoot Clayton Black. To show the jury why he shot him. The court: I will permit that to be done, but there is no use of going into all the details of the former trouble." The court in approving the bill states: "This bill is approved with this explanation: I held that this witness could state any fact or circumstance or any threat of deceased that in any manner had any effect upon his mind at the time of the homicide, but did hold that the details of the former troubles between him and his brothers with deceased could not be testified to by him in this case. And his evidence will show what his testimony was in these particulars."

It is thus seen by the bill that in ruling on the objections made the court held "that the defendant would be permitted to tell of the circumstances that caused him to act at the fatal conflict, and to prove everything that prompted him to carry the gun, and everything that prompted him to shoot Clayton Black—to show the jury why he shot him." And as the court refers us to the testimony in his qualification of the bill, we quote the following from his testimony: "When I started to the doctor's office I took my gun with me. I took the gun because I was afraid that I would meet Clayton Black. I heard that he was in town. I was afraid to meet Clayton Black because he shot me in the back. I was in front of Riley's store on the gallery in the town of Coahoma when he shot me. He also shot my two brothers, Price and Ab. The shot hit me right about there (indicating) to the right of my backbone, right under the shoulder. It was cut out right here (in front under the collar bone). Some people think that my strength was diminished and weakened therefrom, I don't know, I haven't been so stout since. I had a throat trouble for a good while, but it got worse after that wound. I am going on 57 years old. It was something near two years ago that I received that wound before I carried the gun on the Sunday morning of the shooting of Clayton Black prior to April 28th. I weighed about 150 pounds. Before I was shot I weighed about 164. I was not as weak in lung power then as I am now. To some

extent the shooting had weakened my power of speech. The throat
trouble also added to the reducing me to this condition. Prior to the
28th day of April, 1912, I knew the general reputation of Clayton
Black as being that of a dangerous man or a peaceable and quiet, in-
offensive man in the community in which he lived. It was bad. I
knew he was a violent and dangerous man and he shot me and I knew
he would do it again if he got a chance. I had received a communi-
cation of a threat by Clayton Black to take my life just prior to the
day I took the gun. I heard it the evening before, Saturday evening.
I was at John Bell's, Ben Bell's brother—was the man that had told me.
John Bell was shaving me as well as I can recollect. He told me in
the presence of John Bell that the first time he met one of us that one
or the other of us would go to hell without a chart. That is the words
he said. That was one of the reasons that caused me to take my gun
with me when I went to receive that medical treatment on Sunday.
One reason why I took my gun was because that he had shot me before.
No, no other reason, no other than that he shot my brothers. No other
reason that I had particularly except what I had heard. A year or
two before that he had made a talk to old man Nolan. I was standing
near the postoffice gallery and he came up and looked around. Old
man Nolan asked him why do you want to hurt old Bill, he never did
do you a bit of harm, which I never had. I never had when he shot
me. Never had had a cross word with the man in my life. Mr. Nolan
told me about it afterwards. I never heard him make it. Mr. Nolan
came and told me the talk. He says, now I just wanted him to make
a move, I just wanted to kill him. Yes, that Clayton Black said that
about me, that 'I just wanted him to make a move, I wanted to kill
him.' That threat was communicated to me about a week prior to the
time he shot me. It was at the postoffice that I saw Clayton. I went
to town every once in a while. I think Clayton Black was about twenty-
seven or eight years old, maybe thirty, I don't know, approximately, or
in the neighborhood somewhere of thirty years. I would suppose that
he was over six feet tall. I don't know, might have been. He was a
big man. I don't know what his weight was. He was a very large
and muscular man, stout, robust and powerful in strength, I know that
he was. I regarded him as a much more powerful man than I was in
strength."

It is thus seen that the court allowed appellant a broad scope in testi-
fying to the injury he received, etc., but did not let him go into how
the first difficulty originated, and all the details leading up to the
shooting, but did let him tell all that took place at the time of the
shooting, and we think this was as far as he should have been permitted
to go. Of course, whatever a defendant may have known or heard
(when the plea of self-defense is made) that could have affected his
mind and had a tendency to lead him to believe that from the conduct
of the deceased at the time, his life was in danger, should be admitted
in evidence. He is entitled to have that much of a former difficulty
or difficulties which he personally knew or which he had been told about

prior to the fatal encounter admitted, but no more, and in this case we think the court adhered to that rule. But there was no error in refusing to permit the witness John Bell to testify what he individually knew about the former difficulty between deceased and appellant. Appellant in his testimony does not claim that he received any information from John Bell in regard to that matter, and what John Bell knew about it could have no effect on appellant's state of mind at the time of the fatal encounter, nor be of any aid to him in passing on the conduct of deceased at that time. The court permitted the witness John Bell to testify to all threats he said he had heard deceased make at any time, and the further fact that he had communicated such threats to appellant. As to the reason why John Bell was carrying a pistol on the day of the homicide, it would be immaterial to any issue in the case; however, the court did permit him to testify that he was carrying it because he personally feared a difficulty with the deceased, but this fact would not authorize the witness to go ahead and detail what he knew and had heard about the difficulty between deceased and appellant some two years prior to this time. The witness Bell was not on trial for carrying the pistol, and what might have influenced him (Bell) could have no bearing on what had influenced appellant in firing the shot that killed deceased. The witness Bell was not charged with having any criminal connection with this killing.

The court did not err in refusing to permit the witnesses Debenport and Harwell to testify as to what they heard Ben Bell testify at the examining trial. It was not shown that the witness Ben Bell was dead nor beyond the jurisdiction of the court. The remark that counsel for the State made, that they wanted "Ben Bell here; that they did not believe his testimony" ought not to have been made while conducting the examination of the witnesses, but if Ben Bell had been there and testified, counsel could have made that argument in addressing the jury, and it is not a matter for which we would feel authorized to reverse the case, as the testimony of the witness went before the jury.

Neither was it improper for the court to refuse to permit the witness Sandusky to testify what deceased had said about John Bell. Appellant does not claim that he had ever heard of it prior to the shooting, and any threat that deceased may have made to do violence to John Bell would not be admissible. John Bell was not on trial, nor charged with any offense, and it is only acts of violence of which defendant knew or had heard of it which are admissible. Patterson v. State, 56 S. W. Rep., 59; Branch's Crim. Law, sec. 473. In this section of Mr. Branch's work is collated the authorities, and by perusal of them it will be seen when testimony of specific acts are admissible, and how far one may go in adducing such testimony. The facts of such cases are never retried.

It appears by bill No. 7 that when the witness W. N. Brown (whom deceased had in front of him) had answered on direct examination that if deceased "had not had hold of him he would have run," on motion of defendant this was excluded, and no exception was reserved to it,

but on cross-examination he asked the witness, "If Clayton Black had not been stronger than you, you would have been inclined to have gone backwards instead of forward, would you have not?" which question was objected to on the ground that it was argumentative, which objection was by the court sustained. It was the acts and conduct of deceased, and not the acts and conduct of Brown that defendant relied on to present self-defense. What Brown would have done under different circumstances would be immaterial to any issue in the case. He testified in full as to the acts of deceased, and the way they went, and this is what would have made an impression on appellant's mind, and not what Brown might have done if he had been stronger than deceased.

In bill No. 8 the question propounded is given, but not the answer expected to be elicited, therefore the bill is incomplete. But any answer Brown could have given to the question would have been but an opinion, and not a statement of any fact.

Bill No. 9 as qualified by the court and accepted by appellant presents no error. The court says the witness Brown had repeatedly explained his actions and whereabouts as well as that of the deceased, giving their positions, and the continuous questioning had assumed the form of argument instead of permitting the witness to state the facts.

Neither did the court err in sustaining the objection to the question propounded to the witness Coffman as to why he resigned the office of justice of the peace. It is not contended that the answer could or would have shown that the witness had been guilty of any felony or other offense involving moral turpitude, consequently the answer could not and would not have been admissible to affect his credit as a witness.

Appellant, as he contends, to show the interest and bias of Jim Lee Hart, a witness for the State, asked him "if he was in the room with Johnson a short time before Johnson shot Will Echols in the back?" Johnson was not a witness in this case—was not present when appellant shot deceased, and of course the court correctly sustained the objections. Appellant's counsel then changed the question and asked if he "was not present in the house a short time before deceased, Clayton Black, shot Bill Echols in the back," some two years before this difficulty. Objection was made that this did not tend to show interest or bias, and the court instructed counsel to get at it in the proper way, to which remark of the court and action of the court in sustaining the objection to the question propounded appellant excepted. In approving the bill the court states: "Prior to asking the question presented in this bill counsel for the defendant asked this witness the following questions, eliciting the following answers, towit: Q. Wasn't you working for him the very time that Black shot Bill Echols in the back, and from your house? A. I was working for Tom Johnson. Q. Johnson's house? A. Yes, sir; that was Johnson's house. Q. Wasn't you in the house with Clayton Black when he shot Bill Echols in the back? A. I was not. Q. Where were you then? A. I was at the hotel. Q. How

came you at the hotel, did you go there to keep from seeing— A.  I went there to .eat my dinner.

"Then following a number of other questions, the question presented in the bill was asked, followed up by an explanation of defendant's counsel that he had a right to show the interest of this witness, and if it be a fact that he was standing there in the same room with Black and Johnson when Bill Echols was shot in the back, he had a right to prove it.   The question and explanation was clearly assuming facts that were not even shown in evidence, but by this witness the contrary was shown; that is, that he was not in the room at all when Black shot Bill Echols. The effect of my holding was that I would not permit assuming of facts not in evidence in propounding the question."   As qualified the bill presents no error.

While Jim Lee Hart was testifying on cross-examination appellant propounded the following question:  "Is it not a fact that you, to divers parties in the last two years, have expressed your feelings as—"   Here the State interposed objection that the question was too general and appellant should be required to name the parties, time and place.   The objection was sustained, and the court did not err in so ruling, as the objection correctly states the law.   If appellant desired to inquire into those matters he should have named the parties and the time and 'place to whom expressions had been made.

There was no error in admitting the testimony of the witness Mc-Querry in rebuttal.   The appellant had testified he did not advance towards deceased.   The testimony of this witness showed, if believed, that appellant did go towards deceased before he fired the shot that killed him.

It appears that Ben Bell, who had testified at the examining trial, was absent, and appellant was attempting to show that Ben Bell had permanently removed from the State so that his testimony given at the examining trial might be proven up.   Appellant introduced Abe Nolan, who testified he knew Ben Bell, and saw him in Bosque County; that Ben Bell told him he was going to leave to keep from being bothered with this case.   That he said he was going to Oklahoma; that after he first left he came back in about a month and left again.   That the witness had not heard from him since he left the second time.   That Ben Bell had said that he did not intend to be at this trial—that he did not want to be bothered with the case.   At this time the court remarked:  "Gentlemen, it appears to me that the witness Ben Bell has skipped out for the purpose of keeping away from this court." The court should not have made this remark in the presence of the jury, but as appellant had just proven the fact "that the witness had skipped out," by the witness Nolan, no injury could have been done him by the remark.   We do not deem it necessary to reiterate the colloquy between the court and appellant's counsel.   The court contends that appellant's counsel had been very aggravating by repeatedly asking questions to elicit testimony that he had excluded, ignoring the rulings of the court, etc., while the colloquy shows that the court also lost his temper.   This

never should occur. on either side. The court has a right to and should require obedience to his rulings, and counsel should respect them, and while we know it is very exasperating when counsel continually seek to introduce testimony that the court has held inadmissible, yet the court should never, in the presence of the jury, lose his temper and make remarks that necessarily follow such a state of mind. If the court feels called upon to reprimand counsel, he should first send the jury from the room, and then use such measures as will compel respect for his rulings.

These are all the bills in the record—some fourteen in number, and the motion for a new trial is but a reiteration of the grounds stated in the bills of exception. The only additional ground alleges the insufficiency of the evidence. If the jury believed the evidence offered in behalf of the State, it amply supports the verdict.

As before stated, the above are all the grounds relied on in the trial court, but in this court, in the able oral argument made. on the submission of the case, appellant's counsel contend that as the record shows that the alleged offense took place in 1912, before the law was passed repealing the law dividing murder into first and second degrees, consolidating the elements and defining it as only one offense, that the court should not have charged the jury the law as it existed at the time of the commission of the offense, but should have applied the penalty to murder .of the first degree as now fixed. Of course, appellant is right in his contention that he had a right .to have the jury instructed the law as it existed at the time of the commission of the offense—that is, have the court define murder upon express malice, and the punishment to be assessed therefor as now fixed by law unless he elected to be tried under the old law, article 17, Penal Code, and define murder upon implied malice, and the punishment for that offense, if the evidence raises the issue of murder upon implied malice as contradistinguished from express malice. This the court did. The State's theory, and it introduced evidence to support it, was lying in wait, and a killing as soon as deceased appeared in view and an opportunity to shoot occurred. Its evidence tended to show that appellant had gone to the doctor's office and there awaited the appearance of deceased on the street; that as soon as he came in view appellant came out of the office with the gun raised in shooting position; that deceased jumped behind W. N. Brown, and appellant advanced on them, saying to Brown, "Damn you, get out of the way or I will shoot you." Brown says he begged appellant not to shoot Black, but that appellant kept stepping around to get in position where he could shoot Black, and when he did so he fired and killed him. That Black said not a word to appellant, but kept trying to keep behind so that appellant could not shoot him. This makes a case of murder upon express malice, and does not raise the issue of implied malice.

Now the defendant's side of it: . He says he was going to the doctor's office when he saw deceased. He does not claim that deceased said a word to him, but in the light of the former difficulty and the threats

that had been communicated to him, when deceased jumped behind Brown he thought his life was in danger. That he did not advance, but that deceased kept shoving Brown towards him, and when they got near him he shoved Brown to one side and jumped at him, when he fired, believing that deceased was then and there about to kill or do him some serious bodily injury. This presents self-defense, and had the court not so instructed the jury, grievous error would have been committed; but it may be contended that even though the jury did not think that appellant had a right to' believe his life was in danger or believe he was in danger of serious bodily injury, yet the mere fact that deceased jumped behind Brown was enough to cause appellant to commit a sudden or rash act, and that appellant at that time under such circumstances would be incapable of forming a design to kill with a sedate and deliberate mind, and under this state of case an issue of a killing upon implied malice was raised by the evidence, and he should not have been convicted of any higher grade of offense, but this was determined adversely to him by the jury. The charge was submitted to appellant's counsel before it was read to the jury and no such objections raised at the time, and no such complaint made in the motion for a new trial, but in this court for the first time appellant contends that the penalty should have been charged as it now exists and not as it existed at the time he committed the offense, as it had been ameliorated. He had the right of election, and we must presume, in the absence of any complaint in the court below, that he did elect, as the Code authorized him to do, to be tried under the law as it existed at the time the offense was committed.

It is just such cases as this that caused the Legislature to amend old article 723, now 743, of the Code, and provide that the errors in the charge should not be cause for reversal unless objected to when presented to counsel for their inspection. Errors of the character now complained of in the charge were under the old law raised in the motion for a new trial, and this court because of such matters felt impelled to reverse the case. The Legislature desired to correct what it considered an evil, and said this court should not reverse under such circumstances, and should not consider such grounds on appeal when the trial court's attention was not called to such matters before the charge was read to the jury. The court in submitting the penalty authorized a punishment to be assessed as low as five years in the penitentiary if they found the killing occurred upon implied malice, and this he ought to have done. (Chapter 138 of the Acts of the 33rd Legislature, Session Acts on page 278.) In section 5 of the bill it recites, "The fact there are many reversals in criminal cases caused by errors in the charge of the court due to the fact that such errors' were not pointed out to the trial judge before the charge was given," created an emergency, etc. This evidences the fact that the Legislature intended that a case should not be reversed unless the error was pointed out to the trial judge during the trial of the case and before the charge was read to the jury. And as this error in the judge's charge, if error

it be, was not called to the trial court's attention either before the charge was read to the jury nor in the motion for a new trial, it can not be raised for the first time in this court, as it did not prevent appellant from having a fair and impartial trial, in that the jury by the charge as given was authorized and permitted to assess the punishment in accordance with the law as it existed at the time he committed the offense, and as he had the right to be tried under that law, we presume he did so elect, else able counsel would have called the court's attention to such matter at the time the charge was presented to them.

The judgment is affirmed.

*Affirmed.*

ON REHEARING.

November 25, 1914.

HARPER, JUDGE.—This case was affirmed on a former day of this term, and although appellant assigned many grounds in his motion for new trial, all of which were passed on in the original opinion, in his motion for rehearing in this court appellant assigns but one ground, and it was not raised at the time of the trial nor in the motion for new trial, and is sought to be raised for the first time in this court.

The crime of which appellant was convicted is alleged to have occurred April 17, 1912. At that time the law divided murder into two degrees—murder upon express malice and murder upon implied malice. The punishment for murder upon express malice was by death or imprisonment for life, while the punishment for murder upon implied malice was by confinement in the penitentiary for any length of time not less than five years. The court so instructed the jury in his charge, and the jury found appellant guilty of murder upon express malice and assessed his punishment at imprisonment in the penitentiary for life. The court submitted his charge to counsel for inspection, among them being some of the ablest lawyers in that section of the State where the trial took place. No objection was made to the court thus instructing the jury. In the motion for a new trial no complaint of the charge in this respect was urged. However, in this court for the first time, months after the trial court had adjourned, appellant contends that as the trial took place April 23, 1914, he had a right to have the law applied as fixed by the Act of the last Legislature, wherein the degrees of murder were consolidated, and the punishment fixed for murder upon either express or implied malice at either death, imprisonment for life, or any term of years not less than five. As the punishment for murder upon express malice was authorized to be ameliorated by the jury, he had the right to have the punishment affixed at the time of the trial to the offense. This no one will question, but the law that so says also says that under such circumstances the person on trial shall have the right of election as to which punishment he will have submitted to the jury. Article 15 of the Penal Code reads: "When the penalty for an offense is prescribed by one law, and altered by a subsequent law, the

penalty of such second law shall not be inflicted for a breach of the law committed before the second shall have taken effect. In every such case the offender shall be tried under the law in force when the offense was committed, and if convicted, punished under that law; except that when by the provisions of the second law the punishment of the offense is ameliorated, the defendant shall be punished under such last enactment, unless he elect to receive the penalty prescribed by the law in force when the offense was committed."

Appellant was not represented by inexperienced men, but able and astute lawyers. They are supposed to know the law—at least the law charges them and all other men with knowledge of its provisions. When the charge as written, applying the law as it existed at the time of the commission of the offense, was submitted to them, and they made no objection thereto, as the law now provides they shall do if they object to any of its provisions. As they made no complaint thereto in the motion for a new trial, and none while the case was pending in the court where tried, the presumption is, that as the law authorized them to do so, appellant elected to be tried under the law as it existed at the time of the commission of the offense, which they had a perfect right to do. Complaints of this character can not be raised for the first time in this court, but must be raised in the court where the case is tried. We had occasion to discuss this question in the case of Wright v. State, 73 Texas Crim. Rep., 178, 163 S. W. Rep., 976, and James v. State, 72 Texas Crim. Rep., 457, 163 S. W. Rep., 61, and in many cases since then, and we refer to those cases wherein we give reasons why the question here presented can not be raised in this court for the first time.

The motion for rehearing is overruled.

*Overruled.*