## MORTIMORE v. STATE.

(No. 864;  Decided December 23rd, 1916;  161 Pac. 766.)

CONFESSIONS—CRIMINAL LAW—EVIDENCE—EXCULPATORY STATEMENTS —VOLUNTARY CHARACTER OF STATEMENTS—PRELIMINARY PROOF— HOMICIDE—SPECIFIC ACTS OF VIOLENCE BY DECEASED—OPINION EVIDENCE—ERROR WITHOUT PREJUDICE—WITNESSES—REBUTTAL EVIDENCE—TRIAL—INSTRUCTIONS.

1. In a prosecution for murder, a statement voluntarily made by the accused admitting participation in the homicide, which standing alone would be a confession, is not changed in character by exculpatory statements at the same time excusing or justifying it, and its admissability is governed by the rules relating to confessions.

2. When a confession is offered and admitted in a criminal prosecution, the defendant is entitled to have all that was

said at the time introduced in evidence, including exculpatory statements.

3. The mere fact that statements importing guilt were made by the accused in the presence of the prosecuting attorney, or to the deputy sheriff, or both, or that accused was in jail and in the custody of the deputy sheriff, would not exclude them in the absence, in either case, of any improper inducement.

4. The fact that the defendant in a criminal prosecution was only 17 years of age did not render statements made by him to public officers tending to show his guilt, inadmissible in the absence of evidence of threats or promises, or any lack of intelligence or understanding that might throw doubt upon the voluntary character of his statements.

5. In a prosecution for murder of defendant's father, where defendant claimed that the killing was in defense of his brother, evidence of former specific acts of violence of the deceased, committed in the presence of defendant, or which were communicated to him, showing the brutal or dangerous disposition of deceased, are admissible in evidence, not for the purpose primarily of showing the decedent's character, but to explain defendant's motive and what he might reasonably apprehend as to the danger.

6. In a prosecution for murder of defendant's father, evidence of threats by decedent against defendant's mother, not accompanied by an assault or an attempt to carry them out, and evidence that decedent had addressed his wife or daughter by abusive or insulting epithets was properly excluded.

7. In a prosecution for murder, testimony as to whether on the morning of the homicide, defendant was or appeared to be happy or angry was admissible.

8. In a prosecution for murder, a question whether witness thought that when decedent was making an assault on defendant's brother, the brother was in danger, whether referring to the witness' opinion, or what he thought at the time, was incompetent.

9. In a prosecution for murder of defendant's father, where a brother of defendant, in answer to a question what his father was doing, said he was trying to get hold of his brother's throat, any error in sustaining a motion to strike the answer as not responsive, was not prejudicial, where the witness then stated that the father had his brother down and grabbed at his throat and caught him in the face.

10. In a prosecution for murder of defendant's father while he was assaulting defendant's brother, a question as to the strength of decedent, compared with that of his three sons combined, was immaterial.

11. In a prosecution for murder, the admission in evidence in rebuttal, of statements of defendant as to decedent finding fault with him on the morning of the homicide was not, in view of the provisions of Compiled Statutes, 1910, Section 6235, an abuse of discretion.

12. In a prosecution for murder it was proper to refuse a requested instruction, that if the jury should find that the defendant had some weakness of mind, infirmity of temper, or immature judgment due to youth, or any other cause, because of which he was below the average of men, that fact should be considered and defendant given the benefit of such condition, in the absence of any evidence making the instruction applicable aside from the age of defendant.

13. In a prosecution for murder of defendant's father, who was committing an assault on defendant's brother, an instruction that defendant was the best judge of what was necessary to defend himself and of the means to be used for his own protection, and his judgment, if honestly exercised, is, to a large extent, controlling, was properly refused.

ERROR to District Court, Converse County; HON. CHARLES E. WINTER, Judge.

Dewey Mortimore was convicted of manslaughter and brings error. The material facts are stated in the opinion.

*William B. Ross* and *Harry J. Devine,* for plaintiff in error.

The court erred in excluding evidence of specific acts of violence of deceased, known to defendant, many of which occurred in his presence and some of which were made known to him. This evidence would have given the jury an idea as to the degree of apprehension of defendant at the time he shot. It was error to exclude evidence of assaults made by deceased upon defendant's mother and all threats made to do her violence.

It was also error to exclude evidence of abusive and vile epithets made by deceased and addressed to defendant's mother and sister and evidence of an assault made by de-

ceased upon defendant on a prior occasion, all being facts within the knowledge of the family, but not known to others. This evidence would have shown that deceased had his whole family terrorized. The rule of self-defense applies to a defendant, who kills in defense of another, as much as if he killed in defense of himself. (21 Cyc. 826.) A felony may be prevented by any one, not himself in the wrong. (People v. Curtis, 52 Mich 616; Patten v. People, 18 Mich 322.) A man has a right to interfere for the protection of a brother in personal danger, whether the brother was blameless or not. (People v. Curtis, supra.) And the rule of self-defense applies. (State v. Filker, 27 Mont. 451, 91 Pac. 668; People v. McKay, 122 Calif. 628, 55 Pac. 594; Wood v. State, 128 Ala. 27, 29 So. 557; King v. State, 55 Ark. 604, 19 S. W. 110; State v. Auston, 104 La. 409, 29 So. 23; Tudor v. Com., 19 Ky. Law R. 1039, 43 S. W. 187.) Evidence of prior assaults upon others and upon defendant should not have been excluded. (2 Bishop Cr. Pr. 610; Wharton Cr. Evi. 69-84; Ency. of Evi., Vol. 6, pg. 779; Wigmore, Vol. 1, 248 P. 315; Boyle v. State, 97 Ind. 322.) The treatment of defendant's mother immediately preceding the killing was a part of the *res gestae*.. (State v. Beird, 92 N. W. (Ia.) 694; State . Nelson, 166 Mo. 191; Temple v. The People, 4 Lansing's N. Y. 119; King v. Whitehead, 1 C. & P. 67; People v. Curtis, 52 Mich 617; Gunter v. State, 3 Ala. 23; State v. Schleagle, 80 Kans. 325; People v. Lilly, 38 Mich. 270; Hill v. State, 69 Ark. 148.) It is proper to prove the expression of countenance of deceased before the killing to show his state of mind. (State v. Cross, 68 Iowa 180; Comm. v. Booker, 76 S. W. 838.) Every fact tending to show grounds for apprehension of serious danger is admissible. (Bowlus v. State, 130 Ind. 227; Williams v. State, 70 S. W. 756; State v. Shadwell, 22 Mont. 559; Russell v. State, 11 Tex. Court of Appeals, 288; People v. Harris, 95 Mich. 87; McQuiggon v. Ladd, et al., 79 Vt. 90; State v. Golden, 113 La. 791; Monroe v. State, 5 Ga. 85; Sneed v. Territory, 16 Okla. 641; State v. Foster, 49 S. W. 747; Campbell v. Commonwealth, 88 Ky. 403; 6 Ency. of Evi.

766; State v. Felker, 27 Mont. 451; Enlow v. State, 154 Ind, 664; Roger v. State, 8 Okla. Cr. Rp. 226.) Mistreatment of defendant by deceased for years is admissible. (People v. Thomson, 92 Calif. 506; DeForest v. The State, 21 Ind. 23; State v. Scott, 24 Kan. 68; State v. Peterson, 24 Mont. 81; McHugh v. Ter. Okla., 17 Okla. 1.) There is a distinction between the rule of proof as to general reputation and specific acts. State v. Harlon, 38 Mont. 557; State v. Burton, 63 Kan. 602.) For the purpose of showing degree of defendant's apprehension, an assault by another may be shown. (State v. Davis, 51 Ore. 136.) It was error to exclude testimony as to the physical strength of deceased compared with that of his three sons. It was error to exclude evidence of what deceased was doing or trying to do at the time of the killing. The court erred in striking out offered testimony with reference to whether defendant appeared happy or angry at the time of the killing. (5 Ency. of Evi. 706.) Evidence as to the judgment of other witnesses present at the killing, as to the extent of danger, should have been admitted. (People v. Lilly, 38 Mich. 277; People v. Curtis, supra.) The shorthand notes of a statement of Dewey Mortimore made while in the jail should have been excluded as no foundation for its admission had been laid, and for the further reason that it did not contain all that defendant said at the time with reference to the homicide. It was not a voluntary statement in view of the conditions under which it was taken. (12 Cyc. 478.) The age of defendant was relevant in determining whether the confession was voluntary. The fact that a confession was made while defendant was in custody has a material bearing upon its admissibility. (Bram v. U. S., 168 U. S. 532, 18 Sup. Ct. 183; Meinaka v. State, 55 Ala. 47; Grant v. State, 55 Ala. 201; Maull v. State, 95 Ala. 1, 11 So. 218; State v. Trusty, 1 Penn. 319, 40 Atl. 766; Green v. State, 40 Fla. 191, 23 So. 851; State v. Jones, 47 La. Ann. 1, 524, 18 So. 515; State v. Auguste, 50 La. Ann. 488, 23 So. 612; People v. Howes, 81 Mich. 396, 45 N. W. 961; Jones v. State, 58 Miss. 349; State v. Guy, 69 Mo. 430; State v.

York, 37 N. H. 175; People v. Mackinder, 61. N. Y. St. 523, 29 N. Y. Supp. 842; State v. Carson, 36 S. C. 524, 15 S. E. 588; Vrosse v. State, 11 Tex. App. 364; People v. McMahon, 15 N. Y. 384; Gilder v. State, 35 Tex. Crim. App. 360, 33 S. W. 867; State v. Jones, 47 La. Ann. 1, 524, 18 So. 515; Conoly v. State, 2 Tex. App. 412; Austin v. State, 15 Tex. App. 388; Wren v. State, 13 S. W. 865.) The testimony of witness, Jackson, as to his personal knowledge of defendant was incompetent to show reputation. (3 Ency. of Evi. 44; 5 Am. & Eng. Ency. of Law 881.) It was error to exclude defendant's cross-examination of the witness, Jackson, touching his knowledge of the reputation of deceased. (Jackson v. State, 78 Ala. 471; People v. Mayes, 113 Colo. 618; Carthaus v. State, 78 Wis. 560; Abernethy v. Com., 101 Pa. St. 322; Howard v. State, 39 Tex. Crim. App. 494.) A purported confession was erroneously admitted in rebuttal. The prosecuting attorney was guilty of misconduct in commenting upon the fact that the defendant did not take the stand in his own behalf. (Section 6210, Wyo. Comp. Stats. 1910; State v. Graham, et al., 62 Ia. 110; State v. Balch, 31 Kans. 467; Comm. v. Scott, 123 Mass. 239; People v. Doyle, 65 Sup. Ct. Reps. 58 Hun, 536; Hunt v. State, 28 Texas Court of Appeals, 149; Brazell v. State, 33 Texas Criminal Report, 334; State v. Brownfield, 15 Mo. App. 593; Dauson v. State, 24 S. W. 414; State v. Camerson, 40 Vt. 565; State v. Moxley, 102 Mo. 392; State v. Holmes, 65 Minn. 236; State v. Ryan, 70 Iowa, 156; McDonald v. People, 126 Ill. 154; Showalter v. State, 84 Ind. 564; City v. Myers, 34 Kans. 501; State v. Martin, 74 Mo. 549; Hirom Price v. Commonwealth, 77 Va. 395; Wilson v. U. S. 149, U. S. 65; People v. McGungill, 41 Calif. 431; Eubanks v. State, 7 Southern 462; State v. Graves, 95 Mo. 510; Davis v. State, 138 Ind. 15; State v. Baldoser, 55 Iowa, 55.) It was error to refuse a requested instruction directing that consideration be given the youth of defendant. (People's Bargett, 99 Mich. 336, 58 N. W. 328.) The court erroneously refused to give defendant's requested instruction No. 6, which was in substance and effect

that defendant was the best judge of what measures were necessary to defend himself against the attack. (Kent v. Cole, 84 Mich. 579.)

*D. A. Preston,* Attorney General, for the State.

Proof of specific acts prior to the homicide are not admissible on a question of self-defense. (State v. Jefferson, 43 La. Ann. 995, 997, 998; State v. Elkins, 63 Mo. 159.) The general character of the deceased for violence may be shown, but not specific acts committed against other people. (Nichols v. People, 23 Hun (N. Y.) 165; Garner v. State (Fla.) 29 A. S. R. 232; Dupree v. State (Ala.), 73 Am. Dec. 422; Connell v. State (Tex.), 75 S. W. 512.) The exclusion of offered evidence of threats by defendant to kill his wife was not prejudicial, as threats made against a third party are not admissible. There were in the room at the time of the homicide three full grown men and a seventeen year old boy, which negatives the idea that defendant was honestly impressed with fear that his brother was in danger of death or great bodily harm from deceased; there is no proof that deceased was armed or attempting to use a weapon. The evidence shows that defendant did not wait to see whether his brother was in danger or not; he shot immediately. A hired man, Smith, evidently considered the fight of no consequence; the treatment of Mrs. Mortimore immediately preceding the killing is inadmissible to show decedent's state of mind, or as a part of the *res gestae*. (Connell v. State, 45 Tex. Cr. Rep. 142; Thomas v. People, 67 N. Y. 218, at 222-223; Thornton v. State, 107 Ga. 683; Andrews v. State (Ga.) 43 S. E. 852.) It was proper to exclude answers to questions relating to the comparative strength of deceased and his three sons. Opinion evidence is not admissible where direct evidence is obtainable. (Stephenson v. State, 110 Ind. 358, 363.) The opinion of a bystander as to the danger of a person attacked, is not competent. (State v. Rhoades, 29 O. S. 171.) A person cannot give his opinion as to the mental condition of a person; he may state facts, and the jury can then decide. (Ames v. Snider, 69 Ill. 376.)

The confession of defendant was admitted after a foundation therefor had been laid by the State and the question as to the voluntary character of the confession was not disputed by defendant. No promise, duress or threats were used. (Ford v. State, 34 Ark. 650-656; State v. Potter, 18 Conn. 165; Metzger v. State, 18 Fla. 481; State v. Brown, 48 Iowa 382; Hopt v. Utah, 110 U. S. 574; Wilson v. U. S., 162 U. S. 613; Seaborn and Jim v. State, 20 Ala. 15; Levy v. State, 49 Ala. 390; Clay v. State, 15 Wyo. 59.) A witness may testify that the reputation of a person is good and still never have heard that reputation discussed. (People v. Adams, 137 Calif. 580-582; State v. Nelson, 58 Iowa, 208; State v. Lee, 21 Am. Rep. 769.) The fact that certain evidence may have been in part admissible in chief does not render it necessarily incompetent in rebuttal. (Horn v. State, 12 Wyo. 80.) The record does not show that the prosecutor did in fact comment on the failure of the defendant to testify. Affidavits on this point filed with the motion for a new trial are conflicting and having been passed upon by the trial court, the finding should not be disturbed here. The fact that the prosecuting attorney commented upon evidence contained in a confession, after the defendant's counsel had also commented thereon, is not improper. (State v. William, 82 Pac. 353.) There was no evidence upon which instruction No. 9 could be predicated and it is properly excluded. Instruction No. 6 was refused upon either of two grounds; First: that it was misleading in not calling the jury's attention to the fact that defendant claimed that he shot in defense of his brother. While the law of self-defense extends to the defense of the brother, the instruction if given in the form offered was misleading. Secondly: the matters covered by this instruction were already covered by the matters contained in instructions Nos. 12, 13, 22 and 24. Defendant had a fair trial and the cause should be affirmed.

Potter, Chief Justice.

The plaintiff in error, Dewey Mortimore, was charged with the crime of murder in the first degree and found

guilty of manslaughter. He will be referred to as the defendant unless by name. The jury added to the verdict a recommendation that the court be as lenient as possible under the law, and he was sentenced to imprisonment in the penitentiary for the term of not more than three years and not less than two years. The charge was predicated upon the killing of the defendant's father, Silas Mortimore, and it was sought to justify or excuse the homicide as an act in defense of the defendant's brother, Alla Mortimore, who was being violently assaulted by the father.

The evidence shows without conflict that the cause of Silas Mortimore's death was a gunshot wound in the head received when he was assaulting his son, Alla, after having said as he approached him that he would "choke his head off" or "choke him to death." This occurred on the morning of February 15, 1915, at the home of the deceased about eight miles from Glenrock, in Converse county. The family of deceased living with him at that time consisted of his wife, their three sons, Alla, 28, Mote, 25, and Dewey, 17 years of age, and a daughter 19 or 20 years of age. Dewey was temporarily at home from school which he was attending at Casper in an adjoining county. The deceased is described in the evidence as having been a large man, about six feet tall, and weighing about 215 pounds, and of greater physical strength than either of his sons, a drinking man and in the habit of keeping and drinking whiskey at his home; and the testimony shows that he had been drinking on the morning of the homicide.

On February 17, 1915, at the county jail when the defendant was there confined, he stated the circumstances of the homicide to the prosecuting attorney in the presence of the deputy sheriff and a stenographer, and said in effect that he fired the shot which killed his father, and that he did it to save his brother. His statements on that occasion were in reply to questions by the prosecuting attorney, and, together with the questions, were taken down in shorthand by the stenographer and afterwards transcribed by him

and signed by the defendant. The prosecution was permitted to prove these statements over the objection of defendant's counsel, after the stenographer had testified to the accuracy of his notes and transcript and he had been examined as to the circumstances under which the statements were made. Omitting the questions of the prosecuting attorney, the defendant's statements at the time referred to were substantially as follows:

We were eating at the breakfast table and we started eating. Father had drank a little that morning, and my oldest brother and him started talking. Mote was the first one he started talking with, and then my oldest brother and he started talking and he got mad and jumped up from the table and knocked my brother over to the window. He jumped up from the table and hit my brother and said: "I will choke your head off." My brother tried to hold him off and he hit my brother in the face and skinned his eye and his hands. I jumped up from the table and watched a little while and then I felt kind of scared that he would kill my brother. He had my brother down in the window and he coudn't get up. He grabbed him and pushed him right into the window so he couldn't do anything, and the hired man was in there too and my oldest brother and myself, and my mother came in, and she was not eating with us. And a woman and a child that was staying at our place were up stairs. I went to the chimney where the gun was, and by that time he had my brother down so he couldn't do anything as he was all in. My mother tried to make father let go and I seen there was no hope so I shot. I was the length of the room from him. He had said he would kill all of us—not that morning. He always has whiskey and was all the time making trouble lately. Mote was engaged to be married to the woman that was there and father did not want him to get married. I don't know what they were talking about at the table, for when they were quarreling I couldn't eat a thing. The gun was a 25-30 rifle. I did it to save my brother. He (evidently refer-

ring to the father ) has had three revolvers on his desk when
he has been drunk. My father would have choked me to
death last summer if my mother and two brothers had not
stopped him. I was afraid he would kill my brother. I
was scared about it. He was then asked if there was any-
thing else he wanted to tell that he knew, and he was told
to tell only what he wanted to, as he did not have to tell
what he did not want to, and that as his family would
probably be down to talk with him he need not say any-
thing that would hurt him. He then said that he and his
father had a "couple of words about the girl that morn-
ing"; that he liked the girl and was "sticking up for her."

It is contended that these statements should have been
excluded because not voluntary. It seems to be conceded
by counsel that the rules regulating the proof of confes-
sions are applicable to this evidence, for it is not suggested
that they might be admissible if not shown to have been vol-
untarily made. And we are of the opinion that such rules
are applicable, for while a confession is generally restricted
to statements acknowledging or importing guilt, and mere
exculpatory statements denying guilt are not confessions
(1 Greenleaf on Ev., Secs. 170, 216; 1 Wigmore on Ev.,
Sec. 821; 2 Bishop's New Cr. Proc. (2nd Ed.) Sec. 1217),
a statement admitting an act essential to the crime charged
and importing guilt should not be treated as a mere admis-
sion receivable in evidence without a showing of its volun-
tary character, because of other statements at the same time
and in connection with it intended to excuse or justify the
act. (State v. Porter, 32 Or. 135, 49 Pac. 964; People v.
Quan Gim Gow, 23 Cal. App. 507, 138 Pac. 918; State v.
Nagle, 25 R. I. 105, 54 Atl. 1063, 105 Am. St. Rep. 864;
State v. Mariano, 37 R. I. 168, 91 Atl. 21); And see
opinion of Lamar, J., Owens v. State, 120 Ga. 296, 48 S.
E. 21, dissenting from a conclusion criticized as unsound
in Wigmore on Evidence (Vol. 5, Sec. 821.) And it is
held that such a statement should be regarded as a confes-
sion when appearing to have been offered and relied on as

such. (Bram v. U. S., 168 U. S. 541, 18 Sup. Ct. 183, 42 L. Ed. 568.)

Not only does it appear that the statements were offered as a confession, and particularly to show that the defendant fired the fatal shot, but it is the only direct evidence that the shot was fired by him; a condition convincingly attesting the reasonableness of the rule in a case like this that a statement admitting participation in the homicide which standing alone, would be a confession, is not changed in character by exculpatory statements at the same time excusing or justifying it. This is implied by the well settled principle that when a confession is offered and admitted the defendant is entitled to have all that was said at the time introduced in evidence, including exculpatory statements. And that a statement directly involving guilt does not lose its character as a confession from the fact that it was accompanied by statements of an exculpatory nature seems to be conceded or recognized in the many cases applying the rule as to confessions to such statements, without referring to the distinction between a mere admission and a confession. The jury may believe the inculpatory statement and disbelieve what the defendant said on the same occasion in his own favor; and that, it seems, is what the jury did in finding the defendant guilty of manslaughter.

To render the evidence of the statements admissible, it was necessary to show that they were freely and voluntarily made under the rules relating to confessions. And we think that was done, and the evidence properly admitted. The grounds relied on in support of the contention that they were not voluntary are these: That they were made by a boy only 17 years of age when in jail and in custody of the officers, not represented by counsel or by any friend or other person, and upon being informed by the prosecuting attorney that he or they would take the story.

The mere fact that the statements were made to the prosecuting attorney or to the deputy sheriff, or both, would not exclude them, nor the fact that the defendant was in

jail at the time and in the custody of the deputy sheriff, in the absence, in either case, of any improper inducement. (2 Wharton's Cr. Ev. (10th Ed.) Secs. 649, 651a, 661, 662; 12 Cyc. 462, 466, 468; 2 Bishop's New Cr. Proc., Sec. 1238; Murphy v. People, 63 N. Y. 590; McCleary v. State, 122 Md. 394, 89 Atl. 1100; State v. Lance, 166 N. C. 411, 81 S. E. 1092.) The question in such case is whether the statement was voluntary, as in the case of a confession by an accused under other circumstances. (Hartung v. People, 4 Park. Cr. Rep. 319, 333; People v. Rogers, 18 N. Y. 9, 72 Am. Dec. 484; Redd v. State, 64 Ala. 492; State v. Guy, 69 Mo. 430.) The rule is stated in Section 649 of Wharton's Criminal Evidence:

"Confessions made to persons in authority, such as constables, arresting officers, or to magistrates, are not excluded by the mere fact that they were made to such persons, unless it appears that an improper inducement was made by such authoritative person. But the rule is equally well settled that even a slight inducement held out by such a person renders the confession involuntary, because the accused would have reason to believe that such person is not only credible, but is in a position to carry the inducement into effect."

And in Section 662: "A confession is admissible when voluntarily made to a public officer, even though the prisoner be in custody of such officer, unless the confession be in some sense elicited by threats or promises." In Section 661 it is said that legal imprisonment is not such duress as to exclude a confession in the absence of threats or promises. In Spicer v. State, 69 Ala. 159, the court say: "Nor was it material, in the absence of all evidence tending to show that the confessions were involuntary, that they were made while the defendant was under legal arrest, and in response to questions propounded by the officer having her in custody." And in Bishop's New Criminal Procedure, 2nd Ed., (Vol. 2, Sec. 1238): "That the confessing person was, whether lawfully or unlawfully" under arrest,

"while it is a circumstance to be considered, does not alone exclude the confession; yet added facts may." And see State v. Rafferty, 252 Mo. 72, 158 S. W. 585, and an elaborate note on the subject, citing cases on this point and others here raised, appended to the case of Ammons v. State, 18 L. R. A. (N. S.) 768-874, and a later note under Lindsay v. State, 50 L. R. A. (N. S.) 1077-1089. That the accused was not represented by counsel will not alone exclude a confession. (McCleary v. State, supra; State v. Gorham, 67 Vt. 365, 31 Atl. 845; State v. Patterson, 68 N. C. 292; Commonwealth v. Sturtivant, 117 Mass. 122, 19 Am. Rep. 401.)

The statements do not appear to have been made under any promise or threat, or any improper inducement. On the contrary, the stenographer, who was present and took down the statement and transcribed the same as aforesaid, and who was the only witness on the subject, testified that neither of the officers made any threat or tried to influence the defendant to say anything that he did not want to say; that he exhibited no sign of unwillingness, but seemed ready, willing and anxious to tell his story; that the prosecuting attorney told the defendant that he would take the story, but that he need not tell anything if he did not want to, and that whatever he said might be used against him later. And it appears that the first question asked the defendant was: "You are telling this of your own free will, are you Dewey, knowing that it may be used in court against you later"; and that he answered: "Yes." And there was no attempt to show, nor do we find anything in the evidence to indicate that the defendant was frightened or that he felt compelled to make any statement by the fact that he was restrained of his liberty or confined in jail, or the remark of the prosecuting attorney that he would take the story. It is contended by his counsel that the prosecuting attorney's statement that he would take the story might have been understood by the defendant as in the nature of a command. But the caution to the defendant in that con-

nection that he need not tell anything if he did not want to and that what he said might be used against him later, and his affirmative answer to the question that he was making the statement of his own free will, knowing that it might be used in court against him later, in the absence of any explanation to the contrary, seems to dispose of that contention.

The fact that the defendant was only 17 years of age did not render his statement made under the circumstances aforesaid inadmissible. (Wharton's Cr. Ev., (10th Ed.) 676a; 1 R. C. L., p. 561; and see note citing cases in 18 L. R. A. (N. S.) 786; 50 L. R. A. (N. S.) 1082.) Like other facts it is a circumstance proper to be considered in determining whether his statements were made freely and voluntarily, but we find nothing in the evidence or in the record to show any lack of intelligence or understanding on the part of the defendant that might tend to destroy or throw doubt upon the voluntary character of his statements. In Commonwealth v. Cuffee, 108 Mass. 285, it appeared that a boy 13 or 14 years old, while under arrest on suspicion that he was guilty of murder, made statements to the police officers tending to show his guilt, and it was held that those statements were admissible, in the absence of any evidence of threats or promises, other than might be inferred from his arrest and custody and his examination by the officers without warning him of his right not to answer unless choosing to do so, or offering him an opportunity to consult with counsel or friends.

Several assignments of error relate to the exclusion of evidence of specific acts of violence by the deceased upon the defendant and upon other members of the family, and threatening remarks, when the defendant was present, prior to the homicide. The stated purpose of such evidence was to show what the defendant had to apprehend from his former experience with the deceased, as to facts coming under his own observation. It was sought to show these facts by the testimony of Mote Mortimore and Mrs. Mortimore. The grounds of the objection were that the evidence was

incompetent and irrelevant, not part of the *res gestae* nor the proper way to prove character, and not showing threats of injury to Alla. The defendant was permitted to introduce evidence as to the general reputation of the deceased in the community for violence, and the prosecution introduced testimony on the same subject in rebuttal resulting in some conflict in the evidence as to that matter. When the evidence of such specific acts and threats was offered, Alla and Mote Mortimore had testified concerning the facts of the homicide, the former as a witness called by the prosecution, and the latter as a witness for the defendant. Alla stated the circumstances substantially as follows:

We were eating breakfast; my father came to breakfast and we were eating oat meal; he sat down at the table and asked my mother for some gravy. He didn't eat oat meal that morning; mother started for the gravy and he jumped up from the table with his plate and told her he would get it himself. He cussed her. He went to the stove with his dish. I told him I didn't think he was acting the man. He whirled around to me and he said: "Why God damn your soul! I will choke the head off of you!" And he rushed to me, shoved me back in the window and was trying to choke me, and he was shot. Those were the only words I had with him that morning. Mote, Dewey and myself and a fellow named Smith were at the table at the time. Father had sat at the head of the table and Mote at his left. I was on his right. Smith sat next to me, and Dewey next to Mote. Mother was not at the table. "Q. What did your father do to you? A. Well, he blacked one eye and skinned my hand up. Q. Skinned your hand up? A. Yes, and made my nose bleed. Q. Did he at any time get hold of your throat? A. No sir. Q. Did he push you up against the window, or up against this man Smith? A. No, the table was in the other wall. He shoved me back against the window and Smith's chair was up against mine, shoved up against the window. Q. Is Smith here now? A. No. Q. Where is Smith? A. I don't know. Q.

What did Smith do? A. I don't know as he did anything. Q. As I understand it, you and your father were up spatting at each other. A. No, I was in my chair. Q. He pushed you and your chair all up to the window? A. ˙Yes, * * * * I˙was sitting at the table. He just rushed back and shoved me. The chair slipped back by the window down behind Smith. Q. Your father struck you and you heard the shot; that is all you know about it? A. Yes sir, that is all I know about it. Q. Did you hear a warn-ing of any kind? A. No. Q. What did your father do when you heard the shot? A. He fell is all I know. Q. Where did he fall? A. Stretched out on the floor. Q. What did you do? I got up as soon as I could. Q. Where did you get up from? A. Down in the chair. Q. Where were the other members of the family. A. I couldn't say; my mother was right behind him. * * * * Q. What did you do Alla? A. I went out in the kitchen and said we would have to do something and I believe I went out doors. Q. You went out of the house? A. Yes sir. Q. Were you badly hurt? A. Well, my nose was bleeding. Q. What did Dewey say to you? A. Why he told me, he says, 'Oh Al—he says, my father is killed,' or something like that. Q. Did he say he had killed him? A. I couldn't say. * * * * Q. What else did Dewey say to you A. Nothing. Q. What did you˙ hear him say to Mote? A. Didn't hear him say anything to Mote. * * * * Q. What did you hear him say to your mother? A. I didn't hear him say anything to her, not that I know of. Q. Where was˙ this man Smith all the time? A.˙ I couldn't say where he was."

On cross-examination, he stated that his father was drunk that morning; that˙ his father said to his mother when he got up˙to get the gravy, ˙"God damn you, I will get it my-self." Following that he testified as follows: Q. Why was he displeased with your mother? A. I couldn't say he was displeased. She was too slow for him, I suppose. Q. What was her condition at that time? A. My mother

has rheumatism. Q. When he had you shoved back against the window could you get up? A. No. * * * * Q. What was he doing at the time he was shot; what was he trying to do? A. Well, it was just trying to get me by the throat, I suppose. Q. Don't you know what he was trying to do; you say you suppose? A. That is what he was trying to do; he was clutching at my throat as much as he could. He kept trying to, I kept catching him by the hands as much as I could to keep him from it. * * * * Q. Where did you say your mother was? A. She was right behind him. Q. What was she doing? A. Trying to get him off. Q. Was she having any effect, or was she able to? A. She didn't seem to. Q. Couldn't you tell whether she was getting him off? A. Well, she wasn't getting him off. Q. You say you and him had had no difficulty at all? A. No sir, never had. Q. The only thing you had done was to protest against his treatment of your mother? A. Yes sir, that is all. Q. Was your father in the habit of drinking? A. Yes. Q. Did he have any liquor in the house at that time? A. No sir, he drank the last of it that morning. Q. Did he have any liquor at any other place? A. There was at the station at Glenrock. Q. What did he have there? A. A keg. Q. It hadn't been delivered to the house? A. No. Q. Do you know where Mote was at the time your father was trying to get you by the throat? A. No, I couldn't say. Q. Had he ever made any threats against the family prior to that time? A. He had. Q. What had he threatened to do? A. Well, he said he would kill us all if we ever tried to do anything with him.

On redirect examination he was asked whether his father struck him in the face with his fist or his open hand. He answered: "I think it was his open hand, he was trying to catch me by the neck, and I was trying to guard him off." Mote Mortimore related what occurred on that morning as follows:

My oldest brother got up first, and my youngest brother, Dewey, he told me, "I can beat you dressing." I told him,

"I don't think you can," and he jumped out of bed and went to dressing and I waited until he was almost dressed then I got up and commenced to dress, and after he got dressed he said, "I told you I could beat you," and he went on down stairs. By the time he got to the bottom of the steps I was at the top steps ready to come down and he went on down into the dining room and was putting on his overshoes when I got down the steps, and my coat was hanging by the dining room door and the door was open. I walked out to the door and got my coat, and when I turned around putting it on Dewey walked out into the kitchen right behind me. I went on out and started to do the chores and Dewey came out and helped me. After we got through we went in the house and he told me, "Let's play some music." I told him "All right." I got the violin and he got the guitar and he and I sat in the dining room by the stove and played until my mother hollered breakfast. I got up to put the violin away. He told me, "Don't put it away, we will play a tune or two after breakfast." I told him, "No, I have to make off an order after breakfast and I want to get through in time so that my father can catch the train to Douglas," so I put the violin away and walked over and sat down to the table. Just after I sat down my mother asked my father if he wanted some oatmeal. He says, "No, where is the gravy?" She says, "I am going to get it now." She was going to the safe then after a bowl. He commenced swearing at her and jumped up and went out to the kitchen with his plate and was helping himself to gravy, and my oldest brother told him that he was not acting the man. He whirled around. The kitchen cabinet was sitting right by the kitchen door leading into the dining room. He put his plate, kind of pitched it over on the table. He says, "Why, God damn your soul! I will choke you to death!" He ran in and my oldest brother jumped to get up from the table. He knocked him into the window and had him down so he couldn't do a thing, and grabbed him by the throat. My brother threw up his hands and tried to catch

him, and instead of catching him by the throat he got him by the face. One finger was in his left eye. I tried to get around the table to him and when he knocked him back and grabbed him, blood commenced running down my brother's face and on my father's hand. It looked as if he pulled all the skin and meat off of my brother's face as his hand come off, and I thought that my oldest brother was hurt pretty bad from the way it looked. Just then the gun popped and he fell. My oldest brother was trying to get up at that time. Q. What was done at that time? A. Well, we were all—we didn't know what to do—it all happened so quick that we didn't hardly realize what had happened, and as soon as he fell I whirled and looked at the door where the guns all sat. There was no one in sight, all the guns was sitting in the corner where they always sat. We went out into the kitchen and I helped my mother to the lounge and we got her some water. After that I went back into the room where my father was an I staid there with him for quite a while. I then took all the guns out of that room and put them in another room. He said further that his mother followed his father into the dining room when he said that he would choke Alla's head off, and took hold of him saying: "Papa, you wouldn't treat Alla that way at the breakfast table would you?"; that he paid no attention to her, but kept right on, and he (the witness) tried to get around to him, but it all happened in a few seconds. Also that his father commenced cussing his mother before he got up from the table and kept cussing her until Alla told him he didn't think he was acting the man.

Mrs. Mortimore, in her testimony, mentioned the violin and guitar playing by Dewey and Mote, and stated the other facts substantially as above. She testified as to the remarks preceding the assault as follows: "I asked Mr. Mortimore if he wanted oatmeal. He said, no, he wanted gravy. 'Where is the gravy?' I hadn't yet put the rest of the breakfast on the table. So I told him, 'I will get

gravy and put the rest of the breakfast on the table.' He commenced to swear, and he says, 'I don't need any woman to wait on me. I will wait on myself'; so he took his plate and he went to the stove and was helping himself to gravy. In the meantime he was talking very unkind against me. I went to the safe to get the bowl to pour the gravy out when he left the chair. Alla says to him, he says, 'Pa, why don't you act like a man and have some principle,' or something to that effect, and he turned from the stove and started back to the dining room. He set his plate down on the table, swore to Alla and said, 'I will choke your head 'off' or he 'will choke him to death.' I couldn't say, the one or the other."

It was also shown by the testimony of Mote Mortimore that when the deceased was under the influence of liquor he was very quarrelsome, troublesome and dominating, and would jump on to people and hit them with anything he had in his hands if they did not do just as he wanted them to do; also, in answer to a question as to his habit in regard to going armed, that he carried a 45 automatic whenever he went any place, and lots of times when on the ranch, and that he had two pistols, one of which he kept under his pillow and the other hanging by the head of the bed; that he frequently made threats, some of the times when the whole family was present, to use those pistols on his mother and the whole family, saying that he would kill the whole family if he started in on any of them; that such remark was made a number of times, and that he also had said in the presence of defendant and Alla that if he ever killed one member of the family he would kill them all; that on the evening prior to the killing in the conversation with Mote in the dining room the deceased said to him: "I will see all of you buried." Mote also testified that when the deceased was assaulting Alla at the time of the homicide his face was white and his teeth gritted and he was scary looking.

The defendant was permitted to show that on one occasion when the deceased wanted some writing paper the defendant went from the dining room where they were to the desk in the sitting room to see if he could get some for him, and the rest of the family except Dewey and the deceased, went up stairs; that hearing a racket down stairs they rushed down and found the deceased on top of Dewey on the floor in the sitting room; that he had Dewey by the hair with one hand, and when the others went in the deceased got up, walked into the dining room, got all his guns and pistols, all loaded, and put them on the desk in front of him; that the rest of them then left the house for they were afraid the deceased might use the guns; that Alla went out first and saddled his horse saying he was going to have the father arrested and the mother asked him not to do it for the sake of the family; and that he had said that if anybody ever came to arrest him he would kill them if possible.

The several offers to prove other specific acts of violence by the deceased known to defendant, which were excluded, as well as the threatening remarks, were made after objections had been sustained to questions intended to bring out the facts stated in the offers. It was sought to prove thereby that on the morning of the shooting and just prior thereto the deceased when passing Mrs. Mortimore, one of whose legs was crippled from inflammatory rheumatism and the knee swollen, kicked her on that leg and laughed when she screamed; that a short time before the homicide, in the presence of Alla, Mote and the defendant, the deceased caught Mrs. Mortimore by the hair of her head and beat her head against the wall, and the sons were afraid to interfere and protect her; that, in the presence of Alla, Mote and the defendant, the deceased on two occasions brutally assaulted their sister, 19 years old, on one of the occasions knocking her down and beating her, and on another knocking her down and beating her head upon the floor; that on other occasions the deceased mistreated her

in the presence of Alla, Mote, Mrs. Mortimore and the defendant, by twisting her arm so that the bones would stick out and the arm remain swollen for weeks at a time; that during the spring preceding the homicide when the defendant had been ill at Casper and was home at the ranch and an invalid, the deceased knocked him down, got his head under the safe and was on top of him beating him, when he was induced to get off and let him alone, that assault occurring after the deceased had ordered the defendant to get up and go to the field and mow and the latter had said that he was ill and unable to go; that in July, 1914, the deceased assaulted Mrs. Mortimore at a neighbor's ranch, where they were visiting, which resulted in blacking her eyes, and when she returned home with her eyes still black and swollen she told the three sons and the other members of the family of said assault and that it was the cause of her eyes being in that condition; also, that in the presence of Alla, Mote, the defendant, and other members of the family, the deceased made threats to or concerning Mrs. Mortimore, at one or more times saying that he would strangle her, twisting his hands around to show how he would do it, and at other times that she would wake up some morning and find her stomach full of lead, or that he would shoot seven balls into her stomach and the other into his own; that the deceased in the presence of the three sons and others used vulgar and indecent language to Mrs. Mortimore and called her a brutal, offensive name and addressed the sister by certain offensive and insulting epithets, stated in the offer.

It appears that the evidence of these facts was offered to show the defendant's knowledge of the character of the deceased for violence and brutality based upon his own observation. For that purpose where there is evidence tending to show that the defendant acted in self-defense, or, as in this case, in defense of another, evidence of specific acts of violence by deceased in the presence of the defendant, or communicated to him before the homicide, is held to

be admissible by many of the authorities, and we think upon strong and convincing grounds. It is true that the general rule permits the character of the deceased, when admissible at all, to be shown only by evidence of general reputation, and not by evidence of specific acts. Evidence of the violent and dangerous character of the deceased known to the defendant is admissible, where there is evidence tending to prove that the latter acted in self-defense, or in defense of another for whom he might rightfully so act, as an aid in determining the reasonableness of the defendant's apprehension of danger at the time of the homicide. (1 Wharton's Cr. Ev. (10th Ed.) Sec. 63A.) And it is held competent to show such character by evidence of general reputation in the community, on the theory that the defendant may be presumed to know the general reputation of the deceased in that respect. But in several well reasoned cases it is held that former specific acts of violence of the deceased showing his brutal or dangerous disposition and character known to the defendant, that is, acts committed in his presence, or communicated to him before the homicide, are admissible in evidence, not for the purpose, primarily, of showing the deceased's character, but to explain the defendant's motive and what he might reasonably have apprehended as to the danger. (People v. Curtis, 52 Mich. 616, 18 N. W. 385; People v. Harris, 95 Mich. 87, 54 N. W. 648; People v. Farrell, 137 Mich. 127, 100 N. W. 264; State v. Burton, 63 Kan. 602, 66 Pac. 633; Boyle v. State, 97 Ind. 322; Sneed v. Terr., 16 Okl. 641, 86 Pac. 70, 8 Ann. Cas. 354; Bailey v. People, 54 Colo. 337, 130 Pac. 832, 45 L. R. A. (N. S.) 145, Ann. Cas. 1914C, 1142; Bowlus v. State, 130 Ind. 227, 28 N. E. 1115; State v. Beird, 118 Iowa 474, 92 N. W. 694; Bell v. State, 69 Ala. 148, 61 S. W. 918, 86 Am. St. Rep. 188; Comm. v. Garanchoskie, 251 Pa. St. 247, 96 Atl. 513; Campbell v. Comm, 88 Ky. 402, 11 S. W. 290, 21 Am. St. Rep. 348; State v. Felker, 27 Mont. 451, 71 Pac. 668; Foster v. State, 102 Tenn. 33, 49 S. W. 747, 73 Am. St. Rep. 855; State v.

Williams, 168 N. C. 191, 83 S. E. 714; Bullock v. State, 73 Tex. Cr. R. 419, 165 S. W. 196; Williams v. State, 44 Tex. Cr. R. 300, 70 S. W. 756, 100 Am. St. Rep. 855; See also Wharton on Homicide (3rd Ed.) Sec. 272; 6 Ency. Ev. 780; Note to Sneed v. Terr., in 8 Ann. Cas. 357; Note to State v. Feeley, 3 L. R. A. (N. S.) 372; and note to State v. Thompson, 124 Am. St. Rep. 1029, 1030.)

The authorities to the contrary seem to regard such evidence as an attempt to show the character of the deceased. But we think the distinction between evidence for that purpose and evidence to show defendant's actual knowledge of the deceased's character, in such cases, is coming to be more generally recognized, and that it is a reasonable one. The reason for it appears to us to be at least as strong, if not stronger, than that which permits proof of the general reputation of the deceased for violence. Upon this question the court, in Sneed v. Territory, supra, say:

"If the offer of evidence under consideration here can be classed as an attempt to prove character or reputation by specific acts, then it falls within an exception to the general rule; but we think that while the evidence sought to be introduced may tend to show the character of the deceased, yet the purpose of the introduction and the reason for its admissibility was that it showed knowledge in the defendant of the violent temper of the deceased, * * * * *. The knowledge of the defendant, derived from such personal observation, as well as otherwise, of the violent temper of the deceased and his liability to attack persons without cause, is a most important circumstance in determining from the standpoint of the accused the reasonableness of the danger apprehended by him, and from which the defendant might estimate the conduct of the deceased, the character of the attack made upon him, and what one might expect from his assailant, as well as that which he might at the moment deem necessary to guard himself against. Certainly the knowledge derived from this source of the acts of the deceased showing his disposition for violence

and a depraved condition of mind would be as likely or more likely to affect the mind of the defendant than general information he might have obtained in common with the community that the deceased was a man of high temper and violent disposition when in a state of intoxication."

In Boyle v. State, supra, in holding that it was error to exclude communications made to the defendant by the deceased the night before the homicide to the effect that he had shot one man and stabbed another, the court, by Niblack, J., say:

"As, in personal conflicts, every man is permitted, within reasonable limits, to act upon appearances and to determine for himself when he is in real danger, it would seem to follow, as an inevitable consequence, that whoever relies upon appearances, and a reasonable determination upon such appearances, as a defense in a case of homicide, ought to be allowed to prove every fact and circumstance known to him, and connected with the deceased, which was fairly calculated to create an apprehension for his own safety. Any narrower rule than this would, we think, prove inadequate to full justice in all cases of homicide, and would, in many cases, operate as a serious abridgment of the law of self-defense."

The principle permitting this kind of proof to show the defendant's knowledge, as bearing upon the reasonableness of his apprehension of danger at the time of the homicide, is approved in Wigmore on Evidence, wherein the learned author says that, "the fact that the circumstance creating apprehension is a single act or series of acts, instead of a general character, does not necessarily destroy its capacity to create apprehension. Nor does its distance in time from the moment of the affray necessarily have that effect. Such particular acts may or may not in a given case be calculated to create apprehension; but there is no reason for a fixed rule of exclusion, invariably forbidding their consideration. * * * * * Nevertheless, in the majority of jurisdictions, such evidence was, for a long time, absolutely

excluded. In some instances this was probably due to a notion that the deceased's character is sought objectively to be shown by particular acts; but the real purpose is merely to show such conduct as would naturally excite apprehension, whether it objectively indicates a fixed trait of character or not. Certainly all the analogies of the law (apart from the common sense of the situation) favor such evidence; * * * * * The true solution is to exercise a discretion, and to admit such facts when common sense tells us that they could legitimately affect a defendant's apprehensions. The state of the law in more recent times has come on the whole to favor the admissibility of such facts." (1 Wigmore on Ev., Sec. 248.)

In the Michigan case of People v. Harris, supra, after stating that it was competent for the defense to show any facts calculated to affect the mind of the accused or to warrant his apprehension of danger, the court say:

"Suppose that the defense could have shown that the accused had been informed of the fact, or had had personal knowledge of the fact, that in another encounter the deceased had brutally kicked or bitten or choked or stamped upon his antagonist, can it be said that such knowledge or information would not have materially increased his apprehension of danger? * * * * His guilt must depend upon the circumstances as they appeared to him, and his mental condition must necessarily be materially affected by any knowledge he possessed of the physical strength or violent temper of the deceased, or his violence when in anger." And, after referring to Hurd v. People, 25 Mich. 405, the court further say: "The language of that case is equally applicable to this, for knowledge obtained from others or from personal observation of particular acts of violence would be as likely to affect the mind of the prisoner as general information that he might have obtained in common with the community that deceased was a man of high temper."

The underlying principle is that stated in Bishop's New Criminal Procedure (2nd Ed., Vol. 3, Sec. 610), as fol-

lows: "Under a claim of self-defense, where the necessity of the defendant's resorting to it should be judged of by the facts as they appeared to him, whatever they truly were, he may give in evidence whatever he knew of the character, prior conduct, threats, or other utterances of the person with whom he was contending, which, not as showing that the man was bad, but that in the special instance and circumstances he was dangerous, might reasonably have place among the considerations guiding his actions." And in Wharton's Criminal Evidence (Sec. 84): "Taking the authorities as a whole, therefore, we may hold that it is admissible for the defendant, having first established that he was assailed by the deceased, and in apparent danger, to prove that the deceased was a person of ferocity, brutality, vindictiveness, and of excessive strength; such evidence being offered for the purpose of showing, either (1) that the defendant was acting in terror, and hence incapable of that specific malice necessary to constitute murder in the first degree; or (2) that he was in such apparent extremity as to make out a case of self-defense; or (3) that the deceased's purpose in encountering the defendant was deadly. * * * * * And it cannot now be questioned that this is the universal rule in this country and in all prosecutions for homicide, where the defense is self-defense; proof of the dangerous character of the deceased, known to the defendant, and affording him reasonable grounds for belief that he was in imminent danger of death or great bodily harm at the hands of the deceased, only averted by the taking of life, is relevant."

The court, by McClain, J., in State v. Beird, supra, say that the admission of evidence showing the violent, quarrelsome, or reckless disposition of the deceased, or his previous threats towards the defendant, if known to the defendant at the time of the affray, where self-defense is relied on, is under the well-established principle that one who is assaulted and is acting in self-defense is justified in determining, as a reasonable person, the extent of the peril in

which he is placed, by taking into consideration the violent character or previous threats of his assailant, as known to him; and: "In the application of this principle it has been held that instances of specific acts of .violence to others on the part of the deceased, which has come within defendant's observation, or had been communicated to him, may be shown," citing People v. Harris, supra. And upon that principle, and apparently .approving the rule as applied in the case cited admitting evidence of specific acts of violence to others, it was held to be error to exclude evidence of acts of aggression by the deceased towards other persons a short time before, and in the course of his progress to the scene of the affray in which he was killed by the defendant, though such acts were not known to the defendant; it appearing that the defendant claimed to have acted in self-defense.

We are convinced that the better reasoning sustains the rule that such evidence is admissible, under a claim of self-defense where there is evidence tending to support it, when the facts might have affected defendant's apprehensions. There was in this case not merely an impending assault by the deceased upon the defendant's brother, but an actual and violent assault by one of greater strength and with the advantage of position, immediately following a threat, seemingly made in anger, which if carried out, might result not only in great bodily harm to the one assailed, but the taking of his life. That he was in danger of some bodily harm was apparent. The question then was the probability of the assault continuing and the extent of the danger; and we think it clear that the defendant's apprehensions as to that matter might reasonably have been affected by his knowledge of the previous assaults upon himself, his mother and sister. We are of the opinion, therefore, that the evidence to show such acts was admissible and that its exclusion was error and prejudicial; and the prejudice was enhanced by the conflict in the evidence respecting the general reputation of the deceased. We include in this the evidence offered to

show the assault by the deceased upon his wife when visiting at another ranch and immediately communicated by the latter to the defendant and his brothers in explaining, on her return home, what caused her eyes to be blackened and swollen. The mistreatment of Mrs. Mortimore by the deceased on the morning of and just before the homicide by kicking and hurting her crippled leg was clearly admissible for the reason aforesaid, and also as showing the state of mind of the deceased at the time.

The offers to prove certain threats concerning Mrs. Mortimore not accompanied by any assault or followed by an attempt to carry out either threat were properly excluded. We are not prepared to hold that mere threats may show a violent and dangerous character. Such threats, though suggestive of an ugly temper or a mean and brutal disposition, might be made without any intent of carrying the same into execution, or by one never guilty of a violent assault upon another person. The only possible ground, it seems to us, upon which they could be deemed to have affected the defendant's apprehensions would be that they might have added something to the defendant's knowledge of the deceased's character in connection with the violent acts known to him. But it was not offered to show that they were in fact connected with those acts, and we think it would be going too far to hold such isolated threats admissible as bearing upon what the defendant may reasonably have apprehended at the time of the homicide, from his knowledge of the deceased's character. Threatening remarks and conduct of the deceased towards or concerning the family were allowed to be proven, and we think properly.

The evidence offered to prove that the deceased had addressed his wife and daughter by abusive or insulting epithets was properly excluded. We are unable to see how that fact could have had any legitimate effect upon what the defendant may have reasonably apprehended.

Error is assigned upon the refusal of the court to permit Mote Mortimore and Mrs. Mortimore, in answer to ques-

tions propounded to them for that purpose, to state whether the defendant was happy or angry on the morning and at the time of the homicide. The questions propounded to Mote were: "What was Dewey's frame of mind that morning, if you could determine from his conduct and actions?" "What would you say as to whether or not he was in a happy frame of mind?" "Do you know whether or not he was angry that morning?" He was also asked: "What were Dewey's actions to indicate whether he was in a happy or unhappy frame of mind?" The answer to the last question, "He seemed to be happy," was stricken out on objection that it was a conclusion. Before the question asking him if he could say whether or not the defendant was in a happy frame of mind, the witness had affirmatively answered the question if he could determine whether or not he was in such a frame of mind. These questions were asked by counsel for defendant on direct examination. Mrs. Mortimore was asked this question: "Was Dewey angry at the time that he shot, as far as you know" She answered: "He was not." An objection then interposed was sustained, and the ruling excepted to. But she was next asked whether she knew at that time whether or not he was angry or what the condition was, and she answered: "I don't think he was. There was nothing happened to cause him to be angry." Because of this answer which remained in the evidence no prejudice would seem to have resulted from the ruling upon the preceding question and answer, even though the answer be regarded as stricken out. It was not ordered out, though the objection was sustained.

The right of a non-expert witness to state his opinion regarding the appearance and demeanor of another was considered in Horn v. State, 12 Wyo. 80, 73 Pac. 705, at pages 148-152, wherein it was held that a witness was properly permitted to state the manner of the defendant as to sincerity in making an alleged confession. It was held that the testimony was admissible under the rule allowing non-expert witnesses to state their opinion concerning another's

appearance and demeanor, which are incapable of adequate description by other means; and we stated that such opinions are received on the ground of necessity, since from the nature of the fact sought to be elicited no better evidence is obtainable. A number of cases announcing that rule were cited, and we quoted with approval from Hardy v. Merrill, 56 N. H. 227, 22 Am. Rep. 441, among other remarks of the court in that case the following:

"And so, also, in the investigation of mental and psychological conditions; because it is impossible to convey to the mind of another any adequate conception of the truth by a recital of visible and tangible appearances; because you cannot, from the nature of the case, describe emotions, sentiments and affections, which are really too plain to admit of concealment, but, at the same time, incapable of description; the opinion of the observer is admissible from the necessity of the case; and witnesses are permitted to say of a person: 'He seemed to be frightened'; 'he was greatly excited'; 'he was much confused'; 'he was agitated'; 'he was pleased'; 'he was angry.' All these emotions are expressed to the observer by appearances of the countenance, the eye, and the general manner and bearing of the individual; appearances which are plainly enough recognized by a person of good judgment, but which he cannot otherwise communicate than by an expression of results in the shape of an opinion." See 1 Wharton's Cr. Ev., (10th Ed.) Sec. 460; State v. Vanella, 40 Mont. 326, 106 Pac. 364, 20 Ann. Cas. 398. We think it was competent for the witness to state whether on the morning of the homicide the defendant was or appeared to be happy or angry, or whether at the time of the homicide he was or was not angry or what appeared to be his mental condition in that respect. The matter is one of mixed fact and opinion, and the opportunity of the witness to have noticed the condition testified about and how closely it was noticed may be tested on cross-examination, and the weight to be given to the testimony will be for the jury to determine.

Other rulings of the court relating to the evidence here assigned as error are discussed in the briefs under the same head as the rulings last above considered. Objections were sustained to the following questions propounded to Mote Mortimore by counsel for defendant: "When he was making this assault upon your brother, Alla, state whether or not you thought he was in danger?" "At that time state whether or not you thought there was any danger of either death or great bodily harm to your brother Alla?" Whether these questions called for the opinion of the witness as to whether the · danger was imminent, or an expression of what he thought about it at the time, the testimony would be incompetent. The situation was capable of adequate description without stating the observer's impressions or conclusions as to the probable result. If it was competent to show what this witness thought as to the danger, it would also be competent for the prosecution to show by others, if any, who may have been present, what they thought, and that they thought differently about it. But the reasonableness of the defendant's apprehensions is not to be determined by what other persons present at the time may have thought or concluded as to the existence or imminence of danger.

Mote was also asked by counsel for the defendant what his father was trying to do when he was shot. An objection to the question as calling for a conclusion was sustained. Thereupon he was asked what his father was doing, which he answered by saying: "He was trying to get hold of my brother's throat." A motion to strike out that answer as not responsive was sustained. By the next question he was asked to state more in detail what the father was doing, and he then stated that he had his brother down in the window, grabbed at his throat and caught him in the face. That answer seems to have explained the situation sufficiently to remove any prejudicial effect of the rulings upon the preceding question and answer, if erroneous; and the witness had made a similar previous statement. But to say that one

person was trying to get hold of another's throat need not necessarily be a mere opinion or conclusion; it may be intended as a statement of a fact,—as describing the acts or movements of the person referred to. The statement of a witness: "It looked to me as though they were trying to get hold of him to get him down," was held to be a mere conclusion, in State v. Yeater, 95 Kan. 247, 147 Pac. 1114. The attending circumstances may tend to explain what was intended and whether a remark about what one was "trying" to do is stating a fact or a mere conclusion. In this case Alla had testified that his father was trying to get him by the throat and he was trying to keep him from it, thereby, we think, evidently intending to state a fact and not a mere opinion,—what he saw and felt of the deceased's actions; probably meaning the same as that he was clutching at or reaching for his throat. It is conceded that it would be proper to ask what the deceased was doing. And we think the question should be confined to that or to asking that his acts or motions be described. However, in view of the circumstances, it seems to us that the answer of the witness, "he was trying to get hold of my brother's throat," might be fairly understood to mean not what the assailant had in mind to do, but what he was actually doing; as though the witness had said that he was grasping at or, as he did afterwards say, "grabbing at" his throat. While the matter is unimportant because of the subsequent answer and the previous testimony of the same witness, the answer stricken out was not, in our opinion, clearly incompetent as a mere conclusion, or as not responsive to the question.

On defendant's cross-examination of Alla Mortimore he was asked, after having described his father as a large man about six feet tall and weighing about 215 pounds, how he compared physically with him (the witness) and "the boys," evidently referring to Mote and Dewey. He answered that there was no comparison at all, he was a stronger man than either of us. He was asked how his father "would compare with all three of you in regard to physical strength." An

objection to that question as calling for a conclusion was sustained, and that ruling is assigned as error.

It is generally held to be competent on an issue of self-defense where the homicide was connected with an actual or threatened physical assault or combat, to show that the deceased was a stronger man than the defendant, as bearing on the imminence of the danger, and also competent for the prosecution to show that there was no such disparity in size or strength as to induce the defendant to apprehend greater danger on account of any such difference. (21 Cyc. 969, 970; 2 Wharton's Cr. Ev. (10th Ed.) Sec. 930; State v. Nett, 50 Wis. 524, 7 N. W. 344.) And the rule would no doubt apply where the act is claimed to have been done in defense of another so related to the defendant as to justify such an act, since in such case, every circumstance relevant to the plea of self-defense is relevant to show justification to the same extent as if the homicide had been committed in self-defense, and the person so interfering is governed by the status of the one in whose behalf he claims to have acted. (2 Wharton's Cr. Ev. (10th Ed.) Sec. 932; 21 Cyc. 972; Trapp v. Terr'y, 225 Fed. 968, 141 C. C. A. 28.)

But the authorities are in conflict respecting the method of such proof. The majority of the decisions sustain the right to show the difference in physical strength by the direct statement of a witness competent to speak upon the matter that the assailiant or the assailed was the larger or stronger. (Wilkins v. State, 98 Ala. 1, 13 South. 312; Commonwealth v. Barnacle, 134 Mass. 215, 45 Am. Rep. 319; Brownell v. People, 38 Mich. 732; State v. Crea, 10 Idaho 88, 76 Pac. 1013; State v. Buster, 28 Idaho 110, 152 Pac. 196; Smith v. State, 161 U. S. 85, 16 Sup. Ct. 483, 40 L. Ed. 626; Sanchez v. State, 69 Tex. Cr. App. 134, 153 S. W. 1133; And see State v. Nett, supra.) The contrary was held in State v. Barber, 13 Ida. 65, 88 Pac. 418. It was held in Stephenson v. State, 110 Ind. 538, 11 N. E. 360, 59 Am. Rep. 216, that it is not competent for a witness to give his opinion of the subject, but that a witness may describe the

size and build of the parties, and state the facts of any test of their strength which he may have seen, and may also state whether one seemed to be in more robust health than the other, or that one was active and the other clumsy. The court placed the decision on the ground that there could have been nothing about the appearance of the parties indicative of strength not readily described to the jury. It was held in a Washington case, State v. Cushing, 17 Wash. 544, 50 Pac. 512, that it was improper on the question of the strength of the deceased to prove by a witness that on a certain occasion the deceased exhibited great physical strength in lifting a hog into a wagon, but that where the relative strength of the parties to an encounter is in question, it should be shown only by general reputation, the same as when the character of the deceased for violence is sought to be proved; the court referring to and disapproving Stephenson v. State, supra, in that respect.

There would seem to be much reason for permitting the witness to state the strength of his father as compared with his own, for having lived with him all his life it is not impossible that he could have acquired such knowledge as to make his statement one of fact, or at least a competent opinion about a matter incapable of adequate description by other means. (Smith v. U. S., supra.)

Certainly size and weight cannot always be a sure criterion, and evidence of specific tests of strength, if admissible, might not be sufficient to convey to the mind a clear conception of the matter. In State v. Knapp, 45 N. H. 148, testimony as to the exhibition of strength by defendant in his encounters with others was held admissible on a trial for rape, but the court said that, "of course, such testimony would not show respondent's exact strength but it might tend legitimately to show that he possessed ordinary or more than ordinary strength." That question, however, need not be decided, for whatever may be the proper rule respecting the relative strength of the one assailed and his assailant, we fail to see the materiality of the comparative

strength of the deceased and his three sons. The assault was made on Alla, and without any threat at that time of an assault upon either of the others. And it does not appear that the three brothers were acting in concert. We do not suppose it would be contended that to justify the homicide as an act in defense of the defendant's brother it would be necessary to show that the three brothers were incapable of overpowering their father by physical means; or that the alleged defense would be overcome by showing that the three brothers by acting together could have prevented further injury to the one assaulted. Hence whether the objection to the question was or was not properly sustained upon the ground stated, the evidence would be immaterial and the refusal to allow an answer was not error.

The defendant did not go on the stand as a witness, but on rebuttal the prosecution was permitted, over objection that it was not proper rebuttal, to show a conversation between the defendant and others at Glenrock after and on the day of the homicide in which he said that he had been playing on the piano and his father found fault with it, and he, the defendant, went into another room and played the guitar and his father found fault with that, and he then went out in the yard or in the field and when he came back breakfast was ready. The prosecuting attorney stated that this evidence was offered to show a quarrel between the deceased and defendant, and from the remarks of the court in ruling upon the objection the testimony seems to have been admitted on the theory that it might tend to rebut the testimony of Mrs. Mortimore that there had been no trouble that morning. Proper rebuttal of that testimony would be evidence of the fact of trouble by the testimony of a witness who had seen what occurred, and it may be doubtful whether the defendant's admissions or statements concerning it would be admissible for that purpose. Evidence of a quarrel between defendant and deceased, or of defendant's admissions that there had been a quarrel or trouble between them, would be admissible in chief as tending to show motive, and, as a

rule, it ought to be so introduced, thus giving the defendant a clear opportunity to explain or rebut it. But much discretion must be allowed the trial court under the statute (Comp. Stat. 1910, Sec. 6233) providing that after the defendant has produced his evidence the state will then be confined to rebutting evidence unless the court, for good reasons, in furtherance of justice, shall permit it to offer evidence in chief. If the defendant after this evidence had been received on rebuttal had offered himself as a witness, or others, to explain or disprove the statements, it might have been error to deny him that privilege. But, if not strictly rebutting evidence, we are not prepared to hold that the court abused its discretion in admitting it when offered.

The defendant requested an instruction to the effect that if the jury should find that the defendant has some weakness of mind, infirmity of temper or immature judgment due to youth or any other cause, because of which he is below the average of men that fact should be considered and the defendant given the benefit of such condition. Even if correct as an abstract statement of the law, which need not be decided, there was nothing in the evidence making the instruction applicable, aside from the age of the defendant and if that might be considered the instruction goes much further. The case cited by counsel, People v. Borgetto, 99 Mich. 336, 58 N. W. 328, is not in point. In that case there was testimony relating to the defendant's mental condition, and the question considered was the competency of certain rebutting witnesses.

The court also refused an instruction requested by defendant on the subject of self-defense to the effect that the defendant was the best judge of what was necessary to defend himself and of the means to be used for his own protection, and that as a matter of law and common sense the party attacked is obliged to exercise his best judgment at the time as to what shall be done, and his judgment, if honestly exercised, is to a large extent controlling, and absolutely controlling unless the jury find that his exercise of it

at the time and under the circumstances was unreasonable under all the evidence. The instruction, in the first place, would not state the situation accurately as to the assault, which was not upon him but his brother. Its refusal was clearly not prejudicial, in view of the other instructions on the subject of self-defense of which no complaint is made, and which seem to fully and fairly state the generally accepted rules applicable to the case. This instruction seems to have been taken from Kent v. Cole, 84 Mich. 579, 48 N. W. 168, the only case cited in its support. In that case it appears that defendant in an action of trespass for assault and battery, requested an instruction that defendant was the best judge of what was necessary to defend himself against the attack upon him and all the means to be used for his own protection, and the trial court, referring to that request, charged that it was undoubtedly correct as a technical legal proposition, but added the remainder of what is contained in the requested instruction. The defendant was complaining in the appellate court of the entire charge, and that court held, quoting the charge, that, as a whole it correctly stated the law. It is possible that some of the language used in the requested instruction might make it misleading, particularly that about defending himself, as he was not the one attacked. We think it preferable to follow the more generally approved instructions on the subject.

Error is assigned upon certain alleged remarks of the prosecuting attorney during the trial and in argument, which counsel for defendant contend were in violation of the statute permitting a defendant in a criminal case to testify under oath or make a statement without being sworn, and forbidding any comment upon defendant's neglect or refusal to make a statement. The only controversy between counsel as to this matter relates to the making of the alleged remarks and the effect thereof, that is to say, whether they were made as alleged and how they are to be understood or construed. It may be doubtful whether the exceptions are sufficiently shown by the bill, but we have not looked into

that carefully, as we think it unnecessary to consider the questions raised concerning the remarks complained of. They may not arise on another trial, and it is not perceived that their consideration at this time would materially assist in such trial.

For the material and prejudicial errors above pointed out the judgment will be reversed and the cause remanded for a new trial.                                    *Reversed.*

Beard, J., concurs.

Scott, J., did not participate in the decision.